**STATE of Missouri, Respondent,**

v.

**Rhonda Ann BLEDSOE, Appellant.**

**No. WD 63846.**

Missouri Court of Appeals,
Western District.

Oct. 11, 2005.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 22, 2005.

Jeremiah W. (Jay) Nixon, Atty. Gen., Richard A. Starnes, Assistant Attorney General, Jefferson City, MO, for Respondent.

Virgil D. Rodgers II, Tipton, MO, for Appellant.

Before HOWARD, P.J., and SMART and NEWTON, JJ.

VICTOR C. HOWARD, Presiding Judge.

Defendant, Rhonda Bledsoe, was charged with twenty counts of forgery in violation of section 570.090.[1] A jury convicted Defendant of nine of the counts, acquitted her of ten of the counts, and was unable to reach a verdict on one count.

Defendant raises three points on appeal. Her first two points are premised on her argument that the State improperly charged her with twenty counts of the same forgery that were part of a scheme and not separate offenses. In her third point on appeal, Defendant argues that the trial court erred in imposing different sentences on the nine counts of forgery for which she was convicted, because the sen-

---

1. For simplification reasons, statutory references are to the RSMo Cum.Supp.2004, unless otherwise noted. Any amendments to the statutes cited herein made no substantive changes relevant to this appeal.

tences resulted in cruel and unusual punishment.

For the reasons set forth below, we dismiss Defendant's appeal as it relates to Counts 13, 15, and 16, because we lack jurisdiction to consider Defendant's appeal from the trial court's suspended imposition of sentences on those counts. We affirm the convictions on all other counts.

## Background

Defendant does not challenge the sufficiency of the evidence. Viewed in a light most favorable to the verdict, the following evidence was adduced at trial.

In 2000 and 2001, Defendant served as the elected treasurer of the Olean Jaycees in Olean, Missouri. During that time, Defendant was an authorized signatory on the Jaycees' bank account, which had a balance of $13,310.68 when Defendant took office. Karla Montavy, who was secretary of the Jaycees in 2000 and 2001, and her husband, Kendall Montavy, were also authorized signatories. All checks drawn on the Jaycees' account required two signatures. If a member expended his or her own funds for club business, the member would present a receipt at a board meeting, and the board would approve reimbursement.

In 2002, members of the Jaycees' board became concerned with the minimal balance of $12.70 in the Jaycees' checking account, so the board formed an audit committee to investigate. The audit committee members were Donna Whittle, 2002 president; Gary Thompkins, 2002 treasurer; and Gayle Bledsoe, who was treasurer before Defendant and was also Defendant's sister-in-law. The audit committee repeatedly requested that Defendant turn over the banking records and checkbook documenting Defendant's financial dealings during her tenure as treasurer. Defendant stalled, but she eventually provid-ed a computerized printout listing checks with some explanations of their purpose, some receipts, and some, but not all, bank statements.

The audit committee reviewed the documentation provided by Defendant and determined that Defendant had written at least 144 checks by signing her own name and Karla Montavy's name. Ms. Montavy had not authorized Defendant to sign Ms. Montavy's name on the checks. In January 2002, the audit committee met with Defendant to discuss the checks. Defendant offered a sufficient explanation with receipts for many of the checks, but she was unable to provide what the audit committee considered a sufficient club-related explanation for at least twenty of the checks she wrote during the years 2000 and 2001, when she served as treasurer. Thus, the audit committee contacted the police.

The State charged Defendant by Information with twenty counts of forgery—one count for each of the twenty unauthorized checks. Prior to trial, Defendant moved to quash the Information, alleging it was improper to charge twenty separate forgery counts, because the Information presented a "showing of a common scheme." Defendant argued that each check was the same kind of instrument drawn on an account from the same bank and that, except for a change in the date, the counts were all the same. The trial court overruled the motion.

A jury trial began on October 23, 2003. The State presented testimony from members of the audit committee concerning their investigation and each of the twenty checks that were determined to be unauthorized. Ms. Montavy also testified concerning the appearance of her signature on each of the checks, which she had not signed or authorized. In addition, several

members of the Jaycees testified that none of the checks in question had been presented for approval at any of the Jaycees' club meetings.

In her defense, Defendant presented testimony from Lori Kiso, who was president of the Jaycees in 2001. Ms. Kiso testified that she was present when Karla Montavy told Defendant that in preparation for the June 2001 "Testicle Festival,"[2] which was the Jaycees' annual fundraiser, Defendant could sign her name on the checks when the Montavys—the other authorized signatories—were out of town for a week. Defendant testified in her own defense that she signed each of the checks at issue with Ms. Montavy's permission. Defendant explained the club-related purpose for some of the checks and indicated that she had documentation to support her explanations, but she did not have that documentation with her at trial. Defendant could not remember the purpose for some of the checks, but she testified that she never stole or took money from the Jaycees that was not in the form of reimbursement.

The trial court overruled Defendant's objections at the instruction conference to the charging of twenty separate counts for each of the allegedly forged checks, and the jury was instructed on twenty counts of forgery as charged. For each count, the jury was asked to determine whether Defendant, with the purpose to defraud, completed the check so that it purported to have been made by another. The jury found Defendant not guilty of ten of the counts; it was unable to reach a unanimous verdict on one count, so the trial court declared a mistrial; and it found Defendant guilty of the remaining nine counts. In summary form, the following

evidence against Defendant, and Defendant's corresponding explanations for the expenditures, were offered at trial for those counts on which she was convicted:

**Count 9** (check number 652, dated January 8, 2001, for $200), and **Count 10** (check number 653, dated January 12, 2001, for $150). Both checks were payable to "Cash" and endorsed by "R. Neth." (Defendant's maiden name was Rhonda Neth.) Defendant explained that the checks were for "change" for the club. Club members testified that the Jaycees had no January events that would require change.

**Count 13** (check number 698, dated June 7, 2001, for $1,500) was payable to Defendant. Defendant explained that the check was for reimbursement for items sold at the Testicle Festival, which she had ordered from "The Mate" and paid for with a personal check. The Mate's longtime bookkeeper testified that she only received payments from the Jaycees' checking account. The Mate had not been paid with cash or from personal funds that would require reimbursement.

**Count 14** (check number 699, dated June 8, 2001, for $200) was also payable to Defendant and endorsed by Defendant. Defendant explained that the check was to reimburse her for "start-up" cash she supplied for the Testicle Festival.

**Count 15** (check number 720, dated June 26, 2001, for $777) was payable to and endorsed by Defendant. Defendant explained the check was to reimburse her for supplies, meats, and t-shirts for the Testicle Festival.

2. At the annual Testicle Festival, the Jaycees sold fried turkey and bull "fries" (testicles) in addition to hamburgers, other food, and re- freshments such as beer and sodas. Jaycees club members also sold t-shirts, koozies, and "kookie cups."

Count 16 (check number 725, dated July 1, 2001, for $700) was payable to the Missouri State Credit Union and was endorsed by Defendant "for deposit only" in her account. The Jaycees had no accounts or debts at the Missouri State Credit Union. Defendant explained that the check was to reimburse her for some expenses.

Count 17 (check number 728, dated July 9, 2001, for $815.75) was payable to and endorsed by Defendant. Defendant could not remember what the check was for.

Count 19 (check number 705, dated June 6, 2001, for $112.62) and Count 20 (check number 736, dated July 7, 2001, for $112.62). Both checks were payable to "R.F. Inc." Defendant testified that she and her husband owned a "time share" in R.F. Inc., and the checks were for fliers that she bought as advertising director for the Testicle Festival. The members that testified were not familiar with R.F., Inc. and did not recall seeing that many fliers in either month.

The jury recommended sentences of a fine and no imprisonment for Counts 9, 10, 14, 19, and 20, but it could not reach an agreement on punishment for the remaining four counts (13, 15, 16, and 17). The trial court imposed a fine of $2,000 for Counts 9, 10, 14, 19, and 20. The trial court entered sentences of seven years imprisonment on the remaining four counts. For three of those counts (13, 15, and 16) the trial court suspended imposition of the sentences and placed Defendant on five years probation. On the remaining count (17), the trial court entered its sentence pursuant to section 559.115 ("shock incarceration").

This appeal follows.

## Points I and II

In her first two points on appeal, Defendant challenges the trial court's instruction of the jury on each of the twenty counts of forgery. In her first point, Defendant argues that the separate instructions subjected her to double jeopardy "in that all counts were part of a scheme and were not separate offenses." In her second point, Defendant argues that the instructions on the separate counts were improper, "because the completion of each check was not a separate criminal offense but a continuous course of conduct in [that] the act of completing the check instruments was a sole criminal act of a continuous nature and only one act should have been submitted to the jury in the form of a verdict directing instruction."

Before addressing Defendant's arguments challenging instruction on each of the twenty counts, we are compelled to mention two issues restricting the scope of our review:

█ First, as noted above, the jury acquitted Defendant on ten counts (1 through 8, 11, and 12). "On a claim of instructional error, [an appellate] [c]ourt will reverse due to instructional error if there is error in submitting an instruction and prejudice to the defendant." *State v. Belton*, 153 S.W.3d 307, 310 (Mo. banc 2005). A defendant who is acquitted of a charge by the jury cannot show prejudice from any instructional error. *See, e.g., State v. Juarez*, 26 S.W.3d 346, 360 (Mo. App. W.D.2000) (the defendant could not have been prejudiced by any error in submission of a first-degree murder instruction because he was acquitted of first-degree murder). Thus, we need not consider allegations of instructional error for those counts on which Defendant was acquitted.

█ Second, the trial court entered a suspended imposition of sentences on

Counts 13, 15, and 16. As explained by our supreme court:

> It is well-settled that a suspended imposition of sentence is not a final judgment. The word "sentence" in legal terms means "a judgment or final judgment." Where imposition of sentence has been suspended, there can be no judgment.
>
> . . . .
>
> The obvious legislative purpose of the sentencing alternative of suspended imposition of sentence is to allow a defendant to avoid the stigma of a lifetime conviction and the punitive collateral consequences that follow. . . . [W]ith suspended imposition of sentence, trial judges have a tool for handling offenders worthy of the most lenient treatment. Worthy offenders have a chance to clear their records by demonstrating their value to society through compliance with conditions of probation under the guidance of the court.

*Yale v. City of Independence,* 846 S.W.2d 193, 194–95 (Mo. banc 1993) (citations omitted). Rule 30.01(a) and section 547.070 RSMo 2000, authorize appeals in criminal cases after a "final judgment" is entered. Where, as here, there is no final judgment because a sentence has not been imposed, we have no jurisdiction to consider an appeal therefrom. Accordingly, we dismiss Defendant's appeal as it relates to Counts 13, 15, and 16.

■ Turning to Defendant's first two points on appeal, Rule 30.06(c) directs that in criminal appeals, "[t]he statement of facts, points relied on, argument and appendix shall be prepared as provided in Rule 84.04." Rule 84.04(e) provides, in relevant part, "[i]f a point relates to the giving, refusal or modification of an instruction, such instruction shall be set forth in full in the argument portion of the brief." Rule 84.04(h)(3) provides, in rele-

vant part, "A party's brief shall contain or be accompanied by an appendix containing . . . [t]he complete text of any instruction to which a point relied on relates." Defendant has not set forth the challenged instructions in the argument portion of her brief, nor are the challenged instructions included in her appendix. Thus, Defendant's allegations of instructional error are technically not preserved for appeal. *State v. Hauserman,* 64 S.W.3d 893, 897 (Mo.App. S.D.2002).

■ Despite these briefing deficiencies, we may exercise our discretion to review the points of error if the deficiency "does not . . . impede disposition on the merits." *State v. Yole,* 136 S.W.3d 175, 178 (Mo. App. W.D.2004). Given that "we are naturally reluctant to decline appellate review in a criminal case for briefing deficiencies because to do so has the practical effect of punishing the appellant for the failures of his appellate counsel," *State v. Cotton,* 32 S.W.3d 577, 581 (Mo.App. W.D.2000), we will exercise our discretion to review Defendant's first two points on the merits.

■ "Whether a criminal defendant's right to be free from double jeopardy has been violated is a question of law, which is reviewed *de novo.*" *State v. Harris,* 153 S.W.3d 4, 7 (Mo.App. W.D.2005). As explained in *State v. Barber,* 37 S.W.3d 400, 403 (Mo.App. E.D.2001):

> In determining double jeopardy, Missouri follows the separate or several offense rule rather than the same transaction rule. Under this rule, a defendant may be subject to multiple convictions for violations of the same statute if the defendant has in law and fact committed separate crimes. Because Defendant's convictions occurred in a single trial, the only issue regarding double jeopardy is whether the legislature intended that cumulative punishments be imposed. This

component of double jeopardy, protecting defendants from multiple punishments, limits the sentencing court to inflicting only the punishment that the legislature intended. In determining whether the Missouri legislature intended cumulative punishments, or what the "allowable unit of prosecution" is, we first look to the statute under which Defendant was charged and convicted. If that statute is silent, then we look to the general cumulative punishment statute, Section 556.041.

(Citations omitted.)

Defendant was charged with, and the jury was instructed on, twenty separate counts of forgery under section 570.090, which provides, in relevant part:

1. A person commits the crime of forgery if, with the purpose to defraud, the person:

(1) Makes, completes, alters or authenticates any *writing* so that *it* purports to have been made by another . . .

(Emphasis added.) We found no prior case that has determined what constitutes the allowable unit of prosecution for forgery under section 570.090.

■ We have consistently held that "[t]he requirements of forgery are (1) a false making of a writing, (2) a fraudulent intent, and (3) a writing capable of effecting a fraud." *State v. Johnson*, 855 S.W.2d 470, 472 (Mo.App. W.D.1993). We hold that the legislature's use of the singular term "writing," and its corresponding singular pronoun "it," as emphasized above, clearly indicates that the legislature intended each individual writing to be an allowable unit of prosecution under section 570.090.

There is no dispute here that each check is a "writing" under section 570.010(15), which defines "writing" for purposes of section 570.090. Defendant was charged with forging twenty different checks, each of which was a separate "writing," written on a different day, for a different amount. The only similarity between the twenty different forgery charges were that the checks were drawn on the same bank account and Defendant signed both her name and Ms. Montavy's name to each check. Defendant committed a separate offense of forgery each time she forged a different check, and the Missouri legislature intended cumulative punishments.

■ Defendant argues in her reply brief that to interpret the allowable unit of prosecution in section 570.090.1(1) as we have above to mean that each individual check, drawn on the same account, could be charged as a separate forgery offense, "would preclude charging anyone with a continuing course of conduct." However, forgery is not defined as a continuing course of conduct under section 570.090.1(1); the offense was complete upon the Defendant's act, with an intent to defraud, of making, completing, altering or authenticating a single writing so that it purported to have been made by another.[3]

---

**3.** Although Defendant does not specifically cite section 556.041 RSMo 2000 in her brief, her argument regarding her "continuing course of conduct" appears to be a reference to section 556.041(4), which provides that [w]hen the same conduct of a person may establish the commission of more than one offense he may be prosecuted for each such offense. He may not, however, be convicted of more than one offense if . . . [t]he offense is defined as a continuing course of conduct and the person's course of conduct was uninterrupted, unless the law provides that specific periods of such conduct constitute separate offenses. As set forth above, *Barber*, 37 S.W.3d at 403, directs that we need only look to section 556.041, the general cumulative punishment statute, if the statute under which Defendant was charged and convicted is silent as to whether our legislature intended cumulative punishments. Because we are able to determine the allowable unit of prose-

■ Defendant consistently focuses on what she referred to at oral argument as the "bizarre results" reached in this case in support of her argument that she should have only been charged with one count of forgery. In so arguing, Defendant claims that the only issue for the jury to decide was whether Defendant had permission to sign Ms. Montavy's name to the checks or not. She argues that if the jury believed she had permission, then it had to acquit on all twenty charges; or, if it believed she did not have permission, it had to convict on all twenty. However, part of the State's burden was to also prove beyond a reasonable doubt that Defendant had a fraudulent intent as to each of the twenty checks. As explained in the background of this case, Defendant explained the purpose of some of the checks, and she either could not remember why she had written some of the checks or she failed to provide the supporting documentation on others. At this point, it was solely within the jury's province to decide, as to each check, whether Defendant intended to defraud the Olean Jaycees. " 'Credibility and weight of testimony are matters for the jury to determine.' " *State v. Hobbs,* 106 S.W.3d 498, 509 (Mo.App. W.D.2003) (quoting *State v. Gunn,* 57 S.W.3d 347, 350 (Mo.App. W.D.2001)). The jury could very well have believed Defendant's explanations as to the checks on which it acquitted, while at the same time finding that she intended to defraud when she wrote each of the nine checks on which it convicted.

We conclude that the trial court could instruct, and Defendant could be convicted, on each act of writing a check, by which Defendant, "with the purpose to defraud . . . [made], complete[d], alter[ed] or [authenticated]" a "writing so that it pur-

port[ed] to have been made by [Ms. Montavy]" in violation of section 570.090.1(1). Defendant was not subjected to double jeopardy when the court instructed the jury on a separate count of forgery for each of the twenty checks. Thus, Defendant's first two points on appeal are denied.

## Point III

■ In her third point on appeal, Defendant argues the sentences rendered against her were cruel and unusual punishment "in that her sentences for nine identical violations, were disparate and varied widely for violation of identical offenses."

Defendant did not raise this issue in her motion for new trial, nor has she provided this court with a transcript of the sentencing hearing, so we are limited to reviewing her claim for plain error under Rule 30.20. *See State v. Chavez,* 128 S.W.3d 569, 577 (Mo.App. W.D.2004) (issue not raised in motion for new trial not preserved for appeal); and *State v. Schuster,* 92 S.W.3d 816, 821 (Mo.App. S.D.2003) (Rule 30.04(a) states that appellant is responsible for furnishing the appellate court with a sufficient record necessary for determination of the issue on appeal, and failure to do so precludes this court from reviewing an issue not evident from the record.).

We find no error, plain or otherwise, in the sentences imposed by the trial court. *State v. Polley,* 2 S.W.3d 887, 894 (Mo.App. W.D.1999), provides:

Punishment within statutory limits cannot as a matter of law be held cruel and unusual when the statute authorizing the punishment is not invalid and when the punishment imposed is within the range prescribed by the legislature. A punishment within the statutory limits is not

cution under section 570.090, i.e., the statute under which Defendant was charged and con-

victed is not silent, we do not need to look further to section 556.041.

cruel and unusual unless it is so disproportionate as to shock the moral sense of all reasonable men.

(Citations omitted.) Defendant was convicted and the trial court entered sentence on six counts of forgery in violation of section 570.090. (Again, we will not review the suspended imposition of sentence on Counts 13, 15, and 16). For five of the counts (9, 10, 14, 19, and 20), the trial court entered a $2,000 fine in accordance with the jury's recommendation. For count 17, the trial court imposed a sentence of seven years imprisonment, with shock incarceration pursuant to section 559.115. Section 570.090.2 provides that "Forgery is a class C felony." The relevant statutory sentencing provisions authorize punishments for a class C felony of "a term of years not to exceed seven years," section 558.011.1(3), or a fine not exceeding $5,000, section 560.011.1, RSMo.2000.

Here, Defendant does not challenge the validity of the statutes authorizing punishment. The trial court's sentences of fines of $2,000 and seven years imprisonment with shock incarceration pursuant to section 559.115 were within the range of allowable punishments for forgery, a class C felony. Defendant's primary argument appears to be that the sentences were disproportionate as to each other. We disagree. The sentences are not so disproportionate as to shock the moral sense of all reasonable men. Therefore, Defendant was not subjected to cruel and unusual punishment.

Point III is denied.

## Conclusion

We do not have jurisdiction to consider Defendant's appeal of the three counts (13, 15, and 16) on which the trial court suspended imposition of sentences, because there is no final judgment to appeal from, so that portion of her appeal is dismissed.

As for the remaining counts (9, 10, 14, 17, 19, and 20), the trial court could instruct the jury on a separate count of forgery for each check, and the sentences imposed by the trial court did not amount to cruel and unusual punishment. Accordingly, we affirm.

SMART and NEWTON, JJ., concur.