2007-NMCA-105

166 P.3d 1114

**STATE of New Mexico, Plaintiff–Appellant/Cross–Appellee,**

v.

**Reginald TURNER, Defendant–Appellee/Cross–Appellant.**

**Nos. 26,159, 26,256.**

Court of Appeals of New Mexico.

June 15, 2007.

Certiorari Denied, No. 30,525, Aug. 8, 2007.

Gary K. King, Attorney General, Santa Fe, NM, Jacqueline R. Medina, Assistant Attorney General, Albuquerque, NM, for Appellant/Cross–Appellee.

John Bigelow, Chief Public Defender, Susan Roth, Assistant Appellate Defender, Santa Fe, NM, for Appellee/Cross–Appellant.

**OPINION**

PICKARD, Judge.

{1} Defendant appeals his convictions for one count of forgery, one count of fraud over $20,000, and two counts of conspiracy arising out of his refinancing of his marital residence without his then-wife's knowledge or agreement. On appeal, Defendant contends that his two conspiracy convictions violate double jeopardy and that there was insufficient evidence to support his conviction of fraud over $20,000. The State has also filed an appeal asserting that the district court erred in dismissing two additional forgery counts. We reverse in part, holding that Defendant's convictions for two conspiracy counts violated double jeopardy. In all other respects, however, we affirm the district court.

**BACKGROUND**

{2} Defendant and his wife were married in 1995. A few years later, Defendant and his wife purchased a house using money earned from the wife's stock dividends and a loan secured from Defendant's sister and brother-in-law to make a down payment. The remainder of the purchase price was secured by a mortgage.

{3} Defendant and his wife eventually began to have marital problems. It was during that time that Defendant began asking his wife if they could refinance their home. Defendant's wife repeatedly declined his requests, as she had already decided to seek a divorce. Even after the wife's petition for divorce was filed in October 2003, Defendant continued to ask his wife if the house could be refinanced. She continued to refuse.

{4} In 2003, without his wife's knowledge, Defendant contacted GSV Title Services (GSV) regarding a possible refinancing of the marital home. On December 9, 2003, the day set for the closing on the refinancing, Defendant and an unidentified woman—not Defendant's wife—went to GSV to sign the closing documents. Defendant introduced the woman to GSV employees as his wife. Defendant and the woman signed the closing documents together, with the woman signing Defendant's wife's name.

{5} As part of the refinancing, either a home equity line of credit or a second mort-

gage was taken out against the existing equity in the home. After some credit card debt and closing costs and fees were paid from the loan, a check was issued to Defendant and his wife in the amount of $32,635.69. At closing, Defendant told GSV to hold onto the check because he was going on vacation. He later returned to GSV on his own to pick up the check, which was dated about a week after the closing. The check was thereafter negotiated. At trial, Defendant's wife testified that she did not endorse the check and that she did not receive any of the loan proceeds.

{6} On the same day of the closing, a default divorce decree was filed because Defendant had not responded to the petition for divorce. The decree awarded the couple's home to the wife, provided for joint legal custody of the couple's child, set child support payment amounts, and otherwise distributed the couple's remaining community property. Defendant gave his wife a quitclaim deed to the house a month or two after the decree was filed.

{7} Sometime after the divorce, Defendant's wife learned that Defendant had refinanced the home. Defendant was subsequently arrested and indicted on one count of fraud over $20,000, three counts of forgery, and four counts of conspiracy. Before trial, two of the conspiracy charges and two of the forgery charges were dismissed. Defendant was convicted by a jury on the remaining counts. Defendant and the State have both appealed.

## DISCUSSION

{8} On appeal, Defendant contends that his convictions for two counts of conspiracy violate double jeopardy because there was only one agreement to refinance his home and deceive his wife. He further contends that the evidence is insufficient to support his conviction of fraud over $20,000 because the State never proved that the amount of the fraud was over $20,000. In its cross-appeal, the State maintains that the district court erred in dismissing two of Defendant's forgery counts. The State does concede, however, that the district court should have dismissed one of Defendant's two conspiracy counts. Accordingly, we first

address whether Defendant's convictions for two counts of conspiracy violated double jeopardy. Next, we determine whether sufficient evidence exists to convict Defendant of fraud over $20,000. Finally, we address the State's argument on cross-appeal that the district court should not have dismissed two of the forgery counts against Defendant. We hold that the district court erred in allowing two counts of conspiracy to go to the jury and therefore reverse one of Defendant's convictions for conspiracy. As to the remaining issues on appeal, we affirm the district court.

## Conspiracy

{9} Defendant was convicted of conspiracy to commit fraud and of conspiracy to commit forgery, with both convictions stemming from his actions in refinancing the marital home without his wife's permission or knowledge. According to Defendant, because both counts arise out of the same agreement and plan, his conviction on both counts violates double jeopardy. The State concedes that one of the two conspiracy charges should have been dismissed. Although we are not bound by the State's concession, *State v. Foster*, 1999–NMSC–007, ¶ 25, 126 N.M. 646, 974 P.2d 140, we agree with it and therefore reverse one of Defendant's conspiracy convictions on double jeopardy grounds. We review Defendant's double jeopardy claim under a de novo standard of review. *See State v. Bernal*, 2006–NMSC–050, ¶ 6, 140 N.M. 644, 146 P.3d 289.

{10} "The constitutional prohibition against double jeopardy 'protects against both successive prosecutions and multiple punishments for the same offense.'" *State v. Armijo*, 2005–NMCA–010, ¶ 15, 136 N.M. 723, 104 P.3d 1114 (quoting *State v. Mora*, 1997–NMSC–060, ¶ 64, 124 N.M. 346, 950 P.2d 789). In multiple punishment cases there are two types of potential issues: "(1) multiple violations of the same statute, referred to as 'unit of prosecution' cases; and (2) violations of multiple statutes, referred to as 'double-description' cases." *State v. Armendariz*, 2006–NMSC–036, ¶ 20, 140 N.M. 182, 141 P.3d 526. Since Defendant is challenging his two convictions for conspiracy, we

are presented with a "unit of prosecution" case.

{11} Our case law is instructive on unit-of-prosecution cases dealing with multiple conspiracy charges. Under our case law, " 'the number of agreements to break the law determines the number of criminal conspiracies subject to prosecution.' " *State v. Reyes,* 2002–NMSC–024, ¶ 20, 132 N.M. 576, 52 P.3d 948 (quoting *State v. Sanders,* 117 N.M. 452, 457, 872 P.2d 870, 875 (1994)). Notably, "[w]here there is one agreement to commit two or more criminal acts, the perpetrators are guilty of a single conspiracy." *Sanders,* 117 N.M. at 457, 872 P.2d at 875.

{12} We agree with Defendant's assertion—and the State's concession—that only one agreement to break the law existed in the present case. The evidence presented at trial indicates that Defendant and his accomplice agreed that she would pose as Defendant's wife to help him refinance the marital home without his wife's knowledge. Although Defendant and his accomplice committed both forgery and fraud in order to complete the plan, these criminal acts stemmed from a single agreement to refinance Defendant's home using deceptive means. "As there was only one agreement, there can only be one conviction for conspiracy." *Armijo,* 2005–NMCA–010, ¶ 12; *see State v. Tisthammer,* 1998–NMCA–115, ¶ 27, 126 N.M. 52, 966 P.2d 760 ("The number of agreements to break the law is the determining factor in deciding the number of conspiracies."). We therefore reverse one of Defendant's two convictions for conspiracy.

**Fraud Over $20,000**

{13} Defendant argues that his fraud conviction should be reversed because the State did not present sufficient evidence to establish that the amount of the fraud was greater than $20,000. More specifically, Defendant contends that because the house was community property, he possessed an interest in the property. As a result, half of the $32,635.69 loan proceeds obtained by the fraudulent refinancing belonged to Defendant. Thus, according to Defendant, the amount of the fraud was not greater than $20,000.

{14} In New Mexico, fraud consists of (1) "the intentional misappropriation or taking of anything" (2) of value (3) "that belongs to another" (4) "by means of fraudulent conduct, practices or representations." NMSA 1978, § 30–16–6 (2006); UJI 14–1640 NMRA. Defendant maintains that because the marital home and its equity belonged to Defendant and his wife equally, at least half of the proceeds from the refinancing of the home did not "belong to another." Defendant also emphasizes that he was not charged with defrauding anyone but his wife. However, the indictment charged that he misappropriated currency from the mortgage company, and the jury instructions are not clear as to whether Defendant intended to deceive or cheat his wife or another. In any event, we believe that Defendant misconstrues this element of fraud.

{15} Although it addresses a criminal conviction for criminal damage to property rather than a fraud conviction, we find our opinion in *State v. Powels,* 2003–NMCA–090, 134 N.M. 118, 73 P.3d 256, helpful to our analysis. In *Powels,* our Court held that a defendant was not criminally liable for harm to marital property under a statute prohibiting damage to " 'any real or personal property of another.' " *Id.* ¶ 5 (citation omitted). There, the defendant had damaged a car that was jointly owned by the defendant and his wife as community property. *Id.* ¶¶ 2, 5. Our Court concluded that because the defendant had a community property interest in the car, it could not be considered the "property of another" for the purposes of liability under our criminal damage to property statute. *Id.* ¶¶ 1, 5.

{16} In the present case, the property at issue was a check in the amount $32,635.69, which represents a second mortgage or a line of credit secured by the equity in the house. The check thus represents a loan amount to be repaid by the parties borrowing it, i.e., Defendant and his wife. Contrary to Defendant's assertions, therefore, the actual house or its equity are not the property at issue; such items are only relevant insofar as they were used as collateral to secure the loan.

{17} We observe that "[t]he fraudulent obtainment of a loan may be the basis for a conviction of criminal fraud." *State v. Stettheimer*, 94 N.M. 149, 153, 607 P.2d 1167, 1171 (Ct.App.1980). We do not believe that, under the facts of this case, the fact that the loan was secured by community property has any effect on the "belongs to another" element of fraud. Defendant was not entitled to any of the money at the time he obtained it. The lending institution would not have given Defendant the check for $32,635.69 without Defendant's wife's signature on the applicable loan documents. *See* NMSA 1978, § 40–3–13(A) (1993) ("[S]pouses must join in all transfers, conveyances or mortgages or contracts to transfer, convey or mortgage any interest in community real property and separate real property owned by the spouses as cotenants in joint tenancy or tenancy in common."). Thus, the $32,635.69 at issue did not "belong" to Defendant until after he had engaged in his fraudulent scheme to obtain a loan by refinancing the marital home. As such, we are not convinced that a community property analysis is even relevant to Defendant's fraud conviction in the present case.

{18} However, even if the loan or line of credit could be construed as belonging to Defendant even before he engaged in the fraudulent refinancing, we nonetheless agree with the State's assertion that Defendant lost his community property interest in the house and its equity at the time the divorce decree was filed. We observe that our statutes define "community property" as "property acquired by either or both spouses during marriage which is not separate property." NMSA 1978, § 40–3–8(B) (1990). In the present case, both parties agree that the marital home, purchased after the marriage, constituted community property. Separate property is defined, in part, as "property designated as separate property by a judgment or decree of any court having jurisdiction." Section 40–3–8(A)(3). It would therefore appear that the divorce decree awarding Defendant's wife the marital home as her separate property necessarily divested Defendant of any interest in the property.

{19} Defendant argues that because he did not deliver a quitclaim deed to his wife until months after the decree had been filed, he retained an interest in the property. Defendant further maintains that although the divorce decree awarded the house to his wife, he did not know that the decree had been filed when he closed on the refinancing, so he still had a community property interest in the house at closing. Additionally, Defendant maintains that because it was a default divorce decree, it was subject to being set aside, so his community property interest was not extinguished by the decree. Lastly, Defendant contends that because some of the loan proceeds were used to pay community credit card debt, he still had a community property interest in his home. We reject Defendant's arguments.

{20} We disagree with Defendant's assertion that because a quitclaim deed was not given to his wife until months after the refinancing, Defendant retained a community property interest in the house. The decree itself provided that in the event that Defendant refused or otherwise failed to deliver a quitclaim deed to his wife, the court clerk could issue the deed instead. Thus, we believe that "[t]he issuing of the quitclaim deed was a ministerial act required by the court judgment and decree to carry out the judge's order." *Fleet Mortgage Corp. v. Schuster*, 112 N.M. 48, 49, 811 P.2d 81, 82 (1991). Because the delivery of the quitclaim deed was a ministerial act, we do not believe that Defendant's failure to execute it until months after the refinancing necessarily means that Defendant retained an interest in the property up until the date the deed was delivered. *See People v. Allen*, 76 Ill.App.3d 920, 32 Ill.Dec. 287, 395 N.E.2d 397, 399 (1979) (holding that former wife's home was "property of another," where although the divorce decree awarded the house to the former wife, the defendant had not yet delivered a quitclaim deed); *see also Rash v. State*, 182 Ga.App. 655, 356 S.E.2d 719, 720 (1987) (rejecting the defendant's argument that his failure to deliver a quitclaim deed to his ex-wife meant that he retained a property interest in the house and carport that was awarded to the wife in the divorce).

{21} Although Defendant contends that because he did not have notice of the decree

at the time he closed on the refinancing and that default divorce decrees are subject to being set aside, he presents no evidence to suggest that he never actually received notice of the decree or that the decree was later set aside. Moreover, Defendant does not explain how either his lack of notice or the fact that the decree could eventually be set aside necessarily means that he retained a community property interest in the house after the decree was filed.

{22} Similarly, the fact that community debt was paid with part of the loan proceeds does not appear to help Defendant's argument. Such a fact only demonstrates that the title company was unaware that Defendant and his wife had divorced; it does not mean that Defendant retained a community property interest in the house. The facts of this case are that Defendant got the entire amount of money after he was divested of any interest in the house and he was not entitled to any of it. As such, we affirm Defendant's conviction for fraud over $20,000.

**Forgery**

{23} Defendant was originally charged with three counts of forgery relating to different documents signed by Defendant at closing in order to refinance the marital home. Before trial, Defendant filed a motion to dismiss, arguing that the signing of multiple documents constituted a single transaction and that Defendant should therefore only be charged with one count of forgery. The district court agreed with Defendant and dismissed two of the three forgery counts against him.

{24} On appeal, the State contends that the district court erred in dismissing two of the forgery counts against Defendant on double jeopardy grounds. The State argues that the forgery statute evinces an intent by the legislature to punish each act of forgery as a separate offense. Relying on *State v. Baca*, 1997–NMSC–018, 123 N.M. 124, 934 P.2d 1053, and a number of out-of-state cases, the State urges this Court to reverse the district court's dismissal of two forgery counts. We affirm the district court.

{25} As with Defendant's conspiracy counts, this issue presents a potential unit-of-prosecution problem, which is analyzed in two steps. *Bernal*, 2006–NMSC–050, ¶ 14. "First, we review the statutory language for guidance on the unit of prosecution." *Id.* (citing *State v. Barr*, 1999–NMCA–081, ¶¶ 13–14, 127 N.M. 504, 984 P.2d 185). If we are unable to ascertain the unit of prosecution from the statutory language, "we move to the second step, in which we determine whether a defendant's acts are separated by sufficient 'indicia of distinctness' to justify multiple punishments under the same statute." *Id.*

{26} Under the first step of analysis, we consider the language of the forgery statute. Where the statute is explicit with respect to unit of prosecution, we are bound by the language in the statute. *See State v. Morro*, 1999–NMCA–118, ¶ 9, 127 N.M. 763, 987 P.2d 420. The forgery statute provides that:

A. Forgery consists of:

(1) falsely making or altering any signature to, or any part of, any writing purporting to have any legal efficacy with intent to injure or defraud; or

(2) knowingly issuing or transferring a forged writing with intent to injure or defraud.

NMSA 1978, § 30–16–10 (2006). "The different subsections of the forgery statute, which are stated in the alternative, provide for alternative means of prosecution." *State v. Orgain*, 115 N.M. 123, 125, 847 P.2d 1377, 1379 (Ct.App.1993). We observe initially that it is unclear from the record on which subsection Defendant's forgery conviction is based, as the jury was instructed on both subsections. *See State v. Rodriguez*, 113 N.M. 767, 772, 833 P.2d 244, 249 (Ct.App. 1992) (indicating that when a crime is presented to the jury in the alternative and the court cannot tell if the jury found the constitutional or unconstitutional alternative, the conviction must be set aside).

{27} Although not decided on double jeopardy grounds, the Court in *Baca* observed that the second subsection in the fraud statute—" 'knowingly issuing or transferring *a forged writing* with intent to injure or de-

fraud' "—suggested " 'a legislative intent to make each act of forgery, each forged instrument, a separate offense.' " 1997–NMSC–018, ¶ 9 (quoting Section 30–16–10(A)(2), then compiled as Section 30–16–10(B)). The Court expressly left open the question, however, of "whether the Legislature intended multiple punishments under the forgery statute," since it was clear to the Court under the facts of the case that the defendant had committed multiple acts of forgery. *Id.* ¶ 12.

{28} We conclude that the language in the forgery statute is sufficiently ambiguous such that we cannot resolve the unit of prosecution simply by examining the language of the statute. While the language in the second subsection of the statute appears to state a unit of prosecution—"a forged writing"—the first subsection of the forgery statute is less clear. Rather than using the phrase "a forged writing," the first subsection references "*any writing* purporting to have legal efficacy." Section 30–16–10(A)(1) (emphasis added). We observe that "[w]hile some jurisdictions conclude that the use of 'any' is ambiguous ... most construe 'any' to support multiple convictions." *State v. Howell,* 169 N.C.App. 58, 609 S.E.2d 417, 420 (2005). Although not expressly addressed, it appears as though the word "any" is treated as ambiguous by our courts. *See, e.g., State v. DeGraff,* 2006–NMSC–011, ¶¶ 35–36, 139 N.M. 211, 131 P.3d 61 (stating that a statute prohibiting "destroying, changing, hiding, placing or fabricating any physical evidence" did not clearly define the intended unit of prosecution (internal quotation marks and citation omitted)); *Morro,* 1999–NMCA–118, ¶¶ 13–14 (concluding that a statute barring the intentional "defacing, breaking, destroying or removing [of] any tomb, monument or gravestone" did not clearly indicate the unit of prosecution (internal quotation marks and citation omitted)).

{29} The potential ambiguity caused by the word "any" also leads us to conclude that the out-of-state cases relied on by the State in support of its argument are distinguishable on the ground that the respective states' forgery statutes are materially different from New Mexico's. *See, e.g., State v. Bledsoe,* 178 S.W.3d 648, 654 (Mo.Ct.App.2005) (ob-

serving that forgery consists of a "a false making of a writing" (internal quotation marks and citations omitted) in part because the legislature referred to the writing in the singular, but also noting that the defendant forged twenty different checks, each for a different amount and on a different day); *State v. Williams,* 118 Wash.App. 178, 73 P.3d 376, 379 (2003) (observing that a person is guilty of forgery if "[h]e falsely makes, completes, or alters a written instrument" (internal quotation marks and citations omitted)). We further disagree with the State's assertion that the use of singular terms in the forgery statute is a clear indication of legislative intent. *See Morro,* 1999–NMCA–118, ¶ 14 (rejecting argument that singular terms within the statute demonstrates legislative intent with respect to unit of prosecution where such a construction had the potential for absurd results). As such, we do not believe that the forgery statute clearly defines the legislature's intent with respect to the unit of prosecution and therefore move to the second step in our unit-of-prosecution analysis. *See Bernal,* 2006–NMSC–050, ¶ 14.

{30} Under the second step of our analysis, "we determine whether a defendant's acts are separated by sufficient 'indicia of distinctness' to justify multiple punishments under the same statute." *Id.* "Such indicia include the timing, location, and sequencing of the acts, the existence of an intervening event, the defendant's intent as evidenced by his conduct and utterances, and the number of victims." *DeGraff,* 2006–NMSC–011, ¶ 35 (citing *Herron v. State,* 111 N.M. 357, 361, 805 P.2d 624, 628 (1991)).

{31} Turning to the various indicia of distinctness, we conclude that Defendant's conduct appears to be one continuous action rather than three distinct acts with respect to each closing document at issue. Defendant or his accomplice signed the various closing documents during the scheduled closing, which was held at a set time, on a specific day, and at one location. Moreover, Defendant's intent was to refinance the house—Defendant's plan or objective could not be carried out until all of the loan documents were finalized. We therefore believe that the facts of this case present a scenario

materially distinguishable from the cases relied on by the State that involved the passing of bad checks. *See Baca,* 1997–NMSC–018, ¶ 9; *Bledsoe,* 178 S.W.3d at 654. Moreover, although the State argues that documents served different purposes with respect to the refinancing, there is no indication that different victims were impacted by the different documents or that the various documents served any purpose other than to effectuate a single refinancing of the house. Thus, the signing of each document required for the refinancing was not separated by sufficient indicia of distinctness. As such, we conclude that the legislature intended only one conviction for forgery related to Defendant's refinancing of the marital home. We therefore affirm the district court's dismissal of the two forgery counts against Defendant.

## CONCLUSION

{32} We reverse Defendant's conviction of one count of conspiracy and affirm Defendant's remaining convictions.

{33} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID and MICHAEL D. BUSTAMANTE, Judges.