**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:  2011-NMSC-027

Filing Date: June 15, 2011

Docket No. 31,204

STATE OF NEW MEXICO,

    Plaintiff-Appellee,

v.

LAWRENCE GALLEGOS,

    Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF TAOS COUNTY
Eugenio S. Mathis, District Judge

Law Office of Craig C. Kling
Craig Charles Kling
San Diego, CA

for Appellant

Gary K. King, Attorney General
James W. Grayson, Assistant Attorney General
Santa Fe, NM

for Appellee

## OPINION

**BOSSON, Justice.**

**{1}** In this first-degree murder case, we affirm the convictions for murder, aggravated arson, and conspiracy to commit murder.  We find, however, that Defendant's convictions for two other conspiracies violate constitutional principles against double jeopardy.  In so doing, we apply for the first time our unit of prosecution analysis from double jeopardy jurisprudence to multiple conspiracy convictions.  In the course of that analysis, we clarify existing case law and set a new course for the future application of double jeopardy principles to multiple conspiracy convictions.

1

**BACKGROUND**

**{2}**     A jury convicted Defendant of one count of first-degree murder in violation of NMSA 1978, Section 30-2-1(A) (1994); one count of kidnapping in violation of NMSA 1978, Section 30-4-1 (2003); one count of aggravated arson in violation of NMSA 1978, Section 30-17-6 (1963); and three counts of conspiracy in violation of NMSA 1978, Section 30-28-2 (1979). The trial court vacated Defendant's kidnapping conviction because it was subsumed within the first-degree murder conviction. Defendant was sentenced to life imprisonment for first-degree murder, he was given a fifteen-year concurrent sentence for conspiracy to commit first-degree murder, a nine-year consecutive sentence for aggravated arson, a three-year consecutive sentence for conspiracy to commit aggravated arson, and a nine-year consecutive sentence for conspiracy to commit kidnapping.

**{3}**     Defendant raises numerous issues on appeal. Defendant contends (1) there is insufficient evidence of deliberate first-degree murder, (2) there is insufficient evidence to support a conspiracy to commit murder, (3) his convictions on multiple counts of conspiracy violate prohibitions against double jeopardy, (4) the trial court improperly denied Defendant's request for a continuance, (5) all convictions rest on testimony that is inherently improbable as a matter of law, and (6) the trial court improperly denied Defendant's motion for new trial based on newly discovered evidence.

**{4}**     We have jurisdiction to review Defendant's direct appeal pursuant to Article VI, Section 2 of the New Mexico Constitution and Rule 12-102(A)(1) NMRA. *See State v. Smallwood*, 2007-NMSC-005, ¶ 6, 141 N.M. 178, 152 P.3d 821 ("[O]ur appellate jurisdiction extends to appeals from district court judgments imposing a sentence of life imprisonment or death."). We first conclude that substantial evidence supports these verdicts. We dispose of issues 4-6 with only brief discussion. The third issue, multiple counts of conspiracy and double jeopardy, occupies most of our attention in this Opinion. We reverse all but one conspiracy conviction and remand to the district court for further, appropriate action.

**{5}**     The record at trial supports the following factual summary. On September 6, 2003, at approximately 11 p.m., Juan Alcantar ("Victim") was socializing at Richard "Red" Anaya's home in Taos when someone at the residence placed a phone call to the cell phone of Ivan Romero, also known as "Diablo." A little after midnight, September 7, 2003, Victim and Steve Tollardo arrived at a local Taos bar, where security denied them entry. Before leaving the premises, Victim got into a fight with Ivan Romero after Tollardo "called out" Romero, who was inside that bar. Before security broke up the fight, Ivan Romero struck Victim. Victim's girlfriend testified at trial that Victim, at the time, owed Ivan Romero money for drugs.

**{6}**     After leaving the bar, Victim and Tollardo returned to Anaya's home. At approximately 1:15 a.m., someone placed another phone call from Anaya's home to Ivan

2

Romero's cell phone. At approximately 1:45 a.m., Victim went to Allsup's, during which time someone placed an additional phone call from Anaya's home to Ivan Romero's cell phone. Around the same time, Defendant, along with Luis "Tablas" Trujillo and Raquel "Quela" Gonzales, Defendant's girlfriend or wife at the time, stopped by Anaya's home after the bars were closed. After Defendant, Trujillo, and Gonzales arrived at Anaya's home, one or two phone calls were placed between Ivan Romero's cell phone and Anaya's home.

{7} Soon after these phone calls, "out of nowhere," Defendant and Trujillo attacked Victim. After the assault began, Defendant instructed Gonzales, Anaya, and another individual to wait in the back bedroom. Thirty to forty-five minutes later, Defendant came to the back room and instructed Gonzales to clean up Victim's blood from the floor. The only people in the living room and kitchen area at that time were Defendant and Victim. Defendant remained at Anaya's home in charge of Victim, who was still alive.

{8} At approximately 3:00 a.m. on September 7, Tollardo and Trujillo arrived at Elias Romero's shack. Tollardo and Trujillo told Elias Romero that Victim was tied up at Anaya's home and was threatening to kill Ivan Romero, Elias Romero's son. Elias Romero loaded a syringe with heroin and instructed Michelle Martinez, his girlfriend at the time, "[t]o go take care of it." Ultimately, Martinez testified for the State, and much of this evidentiary recitation comes from her testimony. As a long time drug user, Martinez knew that the amount of heroin she was given was a lethal dose and that Elias Romero was asking her to kill Victim. When Tollardo and Trujillo returned to Anaya's home with Martinez, Victim was on the floor with his hands tied behind his back, and Defendant was standing over him with a knife.

{9} When Victim saw Michelle Martinez come into the house, he began to ask for her help. Martinez, who was wearing gloves, immediately pulled out the heroin-filled syringe. When Victim saw the syringe, he began crying in fear for his life. Martinez attempted to grab Victim's arm, but he managed to kick her away. As Defendant continued to stand over him with a knife, Victim eventually stopped resisting, and Martinez was able to inject the full dose of heroin. Following injection, Victim continued crying and asking for help. Tollardo responded by telling Victim that "he shouldn't have fucked with Diablo." Defendant told Victim to ask for forgiveness.

{10} Once the heroin had taken effect, Defendant, Tollardo, and Trujillo moved Victim onto a tablecloth, at which point Victim began to moan and toss about. Michelle Martinez was of the opinion that sudden movements can potentially jolt an individual out of a heroin overdose, and therefore she instructed Defendant and the others to prevent Victim from moving. Several phone calls were again placed from Anaya's home to Ivan Romero's cell phone.

{11} Defendant, Martinez, and Tollardo eventually carried Victim, who at this point was unconscious, to Victim's car, where he was placed in the fully-reclined passenger seat. Defendant sat on top of Victim, and Martinez drove Victim's car to the parking lot of a

3

remote, local church. Once there, Victim again started making noises. In response, Defendant and Martinez tried to kill Victim with other means. Specifically, Defendant tried to snap Victim's neck at least three times, and Martinez tried to suffocate Victim with a plastic shopping bag. When these methods proved ineffective, Defendant removed the shoelace he had been using as a belt and attempted to strangle Victim. This also proved ineffective. Just as Defendant and Martinez were preparing to throw Victim into nearby brush, Tollardo and Trujillo arrived in a separate car. Defendant and Martinez got into Trujillo's car and the group drove off, leaving Victim alone and unconscious, or barely conscious, in the passenger seat of his car.

{12} After stopping at Allsup's, Defendant, Martinez, Tollardo, and Trujillo returned to Elias Romero's shack. As they were driving, Defendant mentioned that fingerprints had been left at the scene and suggested returning to the church to set Victim on fire. When the group arrived at the shack, Elias Romero asked if they had done it, to which they responded in the affirmative. After someone again mentioned burning Victim, Elias Romero instructed Martinez to get some lantern fuel, which she retrieved and placed on a table. Defendant took the fuel and left the shack with Tollardo and Trujillo.

{13} After some time, the three returned to the shack bragging about setting Victim on fire. Tollardo said that he had started the blaze with a cherry bomb. They also mentioned driving to the house of Ivan Romero, who paid Defendant, Tollardo, and Trujillo $50 each. Shortly thereafter, all three men left the shack in Trujillo's car. Several hours later, a series of phone calls was placed from Trujillo's residence to Ivan Romero's cell phone and then from Ivan Romero's cell phone to the same house.

{14} At trial, Victim's cause of death was attributed to both the drug overdose and the church parking lot fire. Victim's lungs contained residue of smoke and soot, indicating that Victim was still alive when he was set ablaze.

**DISCUSSION**

**Sufficient Evidence of Deliberation to Support First-Degree Murder**

{15} Defendant claims the record is insufficient to support a first-degree murder conviction. In applying our standard of review, we first "'view the evidence in the light most favorable to the state, resolving all conflicts . . . and indulging all permissible inferences . . . in favor of the verdict.'" *State v. Graham*, 2005-NMSC-004, ¶ 6, 137 N.M. 197, 109 P.3d 285 (quoting *State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988)). We then "'determine[] whether the evidence, [when] *viewed in this manner*, could justify a finding by *any* rational trier of fact that each element of the crime charged has been established beyond a reasonable doubt.'" *Id.* (quoting *State v. Sanders*, 117 N.M. 452, 456, 872 P.2d 870, 874 (1994)). We are at all times mindful of "the jury's fundamental role as factfinder in our system of justice and the independent responsibility of the courts to ensure that the jury's decisions are supportable by evidence in the record, rather than mere guess

4

or conjecture." *State v. Flores*, 2010-NMSC-002, ¶ 2, 147 N.M. 542, 226 P.3d 641.

**{16}** Our Legislature has defined first-degree murder as "any kind of willful, deliberate and premeditated killing." Section 30-2-1(A)(1).

> "Deliberate intention" is intention that is "arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action." [*State v.*] *Cunningham*, 2000-NMSC-009, ¶ 25, 128 N.M. 711, 998 P.2d 176 (internal quotation marks and citation omitted). We have emphasized that circumstantial evidence alone can amount to substantial evidence. *Id.* ¶ 29; *see also* [*State v.*] *Rojo*, 1999-NMSC-001, ¶ 23, 126 N.M. 438, 971 P.2d 829. Indeed, "[i]ntent is subjective and is almost always inferred from other facts in the case . . . ." [*State v.*] *Duran*, 2006-NMSC-035, ¶¶ 7-8, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted) ("Deliberate intent may be inferred from the particular circumstances of the killing . . . .").

*Flores*, 2010-NMSC-002, ¶ 19.

**{17}** To demonstrate that he did not act with the requisite "deliberate intent," Defendant emphasizes that he was not at Elias Romero's shack when the plot to kill Victim was likely hatched and that there is no direct evidence showing Elias Romero passed along instructions for Defendant to harm Victim in any way. Defendant also argues that, after Trujillo and Tollardo returned to Anaya's home with Michelle Martinez, Martinez *immediately* pulled out a syringe and injected Victim with heroin, leaving Defendant with no opportunity to weigh the consequences of his actions. Defendant additionally claims that his multiple attempts to kill Victim in the church parking lot were not the legal cause of death and, therefore, do not support his conviction for murder. Even assuming the fire could have been the cause of death, Defendant insists that he did not intend to kill Victim but only meant to destroy incriminating evidence by setting the fire.

**{18}** The State responds that Defendant is engaged in a classic case of "divide-and-conquer," whereby each piece of evidence is viewed in isolation, ignoring reasonable inferences from the totality of the circumstances that support guilt. *See Graham*, 2005-NMSC-004, ¶ 13. We agree with the State.

**{19}** The jury reasonably could have concluded that Defendant possessed a deliberate intent to kill throughout the evening. First, the jury could have determined that Defendant possessed a deliberate intent to kill even before Michelle Martinez arrived at Anaya's home and that his intent continued through Victim's death. Such a finding is supported by the timing of the phone calls placed between Anaya's home and Ivan Romero's cell phone; Defendant's participation in the initial, unprovoked assault; and his subsequent acts of clearing witnesses from the area, covering up evidence of the assault, and preparing the house for subsequent criminal conduct. *See State v. Sosa*, 2000-NMSC-036, ¶ 9, 129 N.M.

5

767, 14 P.3d 32 ("Intent is subjective and is almost always inferred from other facts in the case, as it is rarely established by direct evidence." (internal quotation marks and citation omitted)).

**{20}** The jury could have also determined that Defendant continued to possess a deliberate intent to kill when Martinez injected Victim with heroin. By this time, Defendant had been standing guard over the bound Victim with a knife while awaiting the return of Tollardo and Trujillo. Defendant continued his menacing conduct as a gloved Martinez struggled to inject the heroin. Then, when Victim began to cry in fear for his life, Defendant taunted him.

**{21}** Defendant's actions at Anaya's home, which actually took place over the course of a few hours, clearly support the jury's conclusion that Defendant had a sufficient opportunity to weigh the consequences of his actions. *See id.* Of course, Defendant's culpability did not end with the events at Anaya's home. When viewed in the light most favorable to the verdict, Defendant's subsequent conduct in the church parking lot, including his attempt to snap Victim's neck and strangle him with a shoelace, further supports a reasonable finding by the jury that Defendant continued to possess a deliberate intent to kill as the evening unfolded.

**{22}** Defendant's contention that he did not intend to kill Victim when starting the fire is also unavailing. The jury reasonably could have found that Defendant and his co-conspirators knew Victim was alive and returned to the church parking lot to finish the task. Indeed, Martinez testified that Victim was alive when they initially left him in the car at the church parking lot. Furthermore, a forensic pathologist testified that Victim was breathing when the fire started. The jury could have used this evidence to conclude that after several, less-than-successful attempts to kill Victim, Defendant, along with Tollardo and Trujillo, returned to the church parking lot with the deliberate intent to finish the job.

**{23}** "Typically, criminal liability is premised upon a defendant's culpable conduct, the *actus reus*, coupled with a defendant's culpable mental state, the *mens rea*." *State v. Padilla*, 2008-NMSC-006, ¶ 12, 143 N.M. 310, 176 P.3d 299; *accord United States v. Bailey*, 444 U.S. 394, 402 (1980). Here, the forensic pathologist opined that Victim's death was caused by drug intoxication with inhalation of smoke and soot as a "significant contributing condition[]." Based on this testimony, the jury reasonably could have concluded that both the heroin overdose and the fire killed Victim. *See State v. Simpson*, 116 N.M. 768, 772, 867 P.2d 1150, 1154 (1993) ("General principles of criminal law do not require that a defendant's conduct be the *sole* cause of the crime. Instead, it is only required that the result be proximately caused by, or the natural and probable consequence of, the accused's conduct. (internal quotation marks and citation omitted)). Substantial evidence in this case supports a finding of "concurrence" between Defendant's *actus reus* and requisite *mens rea* for willful, deliberate murder of Victim. *See State v. Lopez*, 1996-NMSC-036, ¶ 23, 122 N.M. 63, 920 P.2d 1017.

**Evidence of a Conspiracy to Commit Murder**

6

**{24}** Defendant claims his conviction for conspiracy to commit first-degree murder is not supported by substantial evidence because, again, he was not present at Elias Romero's shack when the agreement to kill Victim was likely formed. We review this claim for a sufficiency of the evidence. *Sanders*, 117 N.M. at 456, 872 P.2d at 874.

**{25}** "The gist of conspiracy under the statute is an agreement between two or more persons to commit a felony." *State v. Deaton*, 74 N.M. 87, 89, 390 P.2d 966, 967 (1964). "In order to be convicted of conspiracy, the defendant must have the requisite intent to agree and the intent to commit the offense that is the object of the conspiracy." *State v. Varela*, 1999-NMSC-045, ¶ 42, 128 N.M. 454, 993 P.2d 1280. "It is the agreement constituting the conspiracy which the statute punishes." *State v. Gilbert*, 98 N.M. 77, 81, 644 P.2d 1066, 1070 (Ct. App. 1982).

**{26}** That Defendant was not physically present at Elias Romero's shack has little bearing on whether he agreed to commit murder, because the State was not required to define the precise moment in time when Defendant entered into a conspiratorial agreement. "A conspiracy may be established by circumstantial evidence. Generally, the agreement is a matter of inference from the facts and circumstances." *State v. Ross*, 86 N.M. 212, 214, 521 P.2d 1161, 1163 (Ct. App. 1974). "The agreement need not be verbal, but may be shown to exist by acts which demonstrate that the alleged co-conspirator knew of and participated in the scheme." *State v. Trujillo*, 2002-NMSC-005, ¶ 62, 131 N.M. 709, 42 P.3d 814. "[T]he prosecutor need not prove that each defendant knew all the details, goals or other participants." *United States v. Perez*, 280 F.3d 318, 347 (3d Cir. 2002). A review of the complete evidentiary record supports a jury finding that Defendant agreed to murder Victim, making it immaterial whether this agreement occurred before Trujillo and Tollardo returned to Anaya's home with Martinez or at some point later that evening.

**Defendant's Multiple Conspiracy Convictions Constitute Double Jeopardy**

**{27}** Defendant argues that he has been improperly convicted of three counts of conspiracy: (1) conspiracy to commit first-degree murder, (2) conspiracy to commit kidnapping, and (3) conspiracy to commit aggravated arson. According to Defendant, his three convictions for violating the same conspiracy statute runs afoul of the prohibition against double jeopardy. The State responds that the existence of one or more conspiracies is purely a factual issue for the jury to decide, one that does not implicate double jeopardy principles. Applying a deferential, sufficiency-of-the-evidence standard, the State relies on substantial evidence to support each of the three conspiracy convictions.

**{28}** We find ourselves squarely faced with a conflict in terms of how our courts should analyze a double jeopardy challenge to multiple conspiracy convictions. Proceeding as the State suggests, with a pure substantial evidence review, would lead almost inevitably to affirmance. There is no doubt that each of the three conspiracy convictions is supported by substantial evidence in the record, but substantial evidence does not address legislative intent. Proceeding as Defendant proposes leads to a more nuanced, analytical review, which

7

acknowledges the court's role in determining whether multiple punishments for violation of the same criminal statute conflicts with legislative intent.

**{29}** Strangely, the question of which body of law to apply to multiple conspiracy convictions has never been directly presented to this Court, and so we are faced with an issue of first impression. *State v. Bernal*, 2006-NMSC-050, ¶ 23, 140 N.M. 644, 146 P.3d 289; *cf. State v. Turner*, 2007-NMCA-105, ¶¶ 10-12, 142 N.M. 460, 166 P.3d 1114; *State v. Jackson*, 116 N.M. 130, 133-34, 860 P.2d 772, 775-76 (Ct. App. 1993). Before taking that question head on, we begin with a brief discussion of basic double jeopardy principles.

**{30}** The double jeopardy clause of both the federal and state constitutions affords three levels of protection to a criminal defendant. "'It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.'" *Swafford v. State*, 112 N.M. 3, 7, 810 P.2d 1223, 1227 (1991) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)). Defendant has been convicted three times of violating the same conspiracy statute, and therefore this is a multiple punishment case.

**{31}** We classify multiple punishment cases in two ways. First, there are "'double description [cases] in which a single act results in multiple charges under different criminal statutes.'" *Bernal*, 2006-NMSC-050, ¶ 7 (quoting *Swafford*, 112 N.M. at 8, 810 P.2d at 1228). Second, there are "unit of prosecution [cases] in which an individual is convicted of multiple violations of the same criminal statute." *Id.* (quoting *Swafford*, 112 N.M. at 8, 810 P.2d at 1228). This being three convictions under the same conspiracy statute, we apply a unit of prosecution analysis. For unit of prosecution cases, we have previously instructed courts to engage in the following two-step analysis:

> First, we review the statutory language for guidance on the unit of prosecution. *State v. Barr*, 1999-NMCA-081, ¶¶ 13-14, 127 N.M. 504, 984 P.2d 185. If the statutory language spells out the unit of prosecution, then we follow the language, and the unit-of-prosecution inquiry is complete. *Id.* ¶ 14. If the language is not clear, then we move to the second step, in which we determine whether a defendant's acts are separated by sufficient "indicia of distinctness" to justify multiple punishments under the same statute. *Id.* ¶ 15. In examining the indicia of distinctness, courts may inquire as to the interests protected by the criminal statute, since the ultimate goal is to determine whether the legislature intended multiple punishments. *See State v. Alvarez-Lopez*, 2004-NMSC-030, ¶ 42, 136 N.M. 309, 98 P.3d 699. If the acts are not sufficiently distinct, then the rule of lenity mandates an interpretation that the legislature did not intend multiple punishments, and a defendant cannot be punished for multiple crimes. *Barr*, 1999-NMCA-081, ¶ 14.

*Bernal*, 2006-NMSC-050, ¶ 14.

8

**{32}** We are mindful that both stages of the unit of prosecution analysis turn on legislative intent. *See Herron v. State*, 111 N.M. 357, 359, 805 P.2d 624, 626 (1991) ("The issue, though essentially constitutional, becomes one of statutory construction."). As we have previously recognized, "the *only* function the Double Jeopardy Clause serves in cases challenging multiple punishments is to prevent the prosecutor from bringing more charges, and the sentencing court from imposing greater punishments, than the Legislative Branch intended." *State v. Pierce*, 110 N.M. 76, 84-85, 792 P.2d 408, 416-17 (1990) (internal quotation marks and citation omitted); *see also Missouri v. Hunter*, 459 U.S. 359, 366 (1983) (The prohibition against multiple punishment "prevent[s] the sentencing court from prescribing greater punishment than the legislature intended.").

**{33}** Accordingly, even when analyzing whether an "indici[um] of distinctness" sufficiently separates the acts of the accused to justify multiple punishment, we remain guided by the statute at issue, including its language, history, and purpose, as well as the quantum of punishment that is prescribed. *State v. Vallejos*, 2000-NMCA-075, ¶ 7, 129 N.M. 424, 9 P.3d 668; *see also State v. Frazier*, 2007-NMSC-032, ¶ 50 n.3, 142 N.M. 120, 164 P.3d 1 (Chavez, C.J., specially concurring) ("[I]f the defendant was charged with multiple violations of the same statute, a unit-of-prosecution case, then the only question to be answered in determining whether two charges are the 'same offense' is whether the defendant's conduct underlying each charge was part of the 'same act or transaction' as defined by the legislature." (emphasis omitted)).

**{34}** We have not, however, had occasion to apply our unit of prosecution case law to the crime of conspiracy. In fact, as the State suggests, our case law currently treats the question of more than one conspiracy as an issue of fact for the jury, whose determination is reviewed by our courts for a mere sufficiency of the evidence. *See Ross*, 86 N.M. at 215-16, 521 P.2d at 1164-65. This is the position advocated by the State as the basis for review here. We codified this deferential standard in *Sanders*, where we wrote the following:

> The standard for determining whether one who has conspired to commit a number of crimes is guilty of one or more conspiracies was established in [*Ross*, 86 N.M. at 214-15, 521 P.2d at 1163-64]. In *Ross*, our Court of Appeals held that the number of agreements is the focus for determining the number of conspiracies: Where there is one agreement to commit two or more criminal acts, the perpetrators are guilty of a single conspiracy. Because the conspiracy statute, NMSA 1978, Section 30-28-2 (Repl. Pamp. 1984), criminalizes the agreement constituting the conspiracy, [*Gilbert*, 98 N.M. at 81, 644 P.2d at 1070], the number of agreements to break the law determines the number of criminal conspiracies subject to prosecution. We review the question whether there was one agreement or several under the sufficiency-of-evidence standard set out above. *See State v. Hernandez*, 104 N.M. 268, 278, 720 P.2d 303, 313 (Ct. App.) (stating that determination of number of conspiracies is fact question for jury; jury findings reviewed under sufficiency-of-evidence principles), *cert. denied*,

104 N.M. 201, 718 P.2d 1349 (1986).

117 N.M. at 457, 872 P.2d at 875.

**{35}** Neither *Sanders* nor *Ross* purports to be a double jeopardy case or makes a conscious decision *not* to apply double jeopardy principles. It appears that our courts have looked at multiple conspiracies in terms of substantial evidence almost by default. Accordingly, the case before us presents the first opportunity, or at least the first of which we are aware, to bring together both analytical points of view—sufficiency of the evidence and multiple punishment/double jeopardy—and to determine the proper role for each.

**{36}** Our holding in *Sanders* is largely based on the United States Supreme Court's opinion in *Braverman v. United States*, 317 U.S. 49 (1942). The defendants in *Braverman* were convicted of seven counts of conspiring to violate portions of the U.S. Internal Revenue Code relating to the unlawful production, possession, transportation, and distribution of liquor. *Id.* at 50 n.1. The Supreme Court reversed all but one of the seven convictions after the government conceded that the defendants had entered into only one agreement to commit an assortment of crimes. The Court reasoned that "[t]he single agreement is the prohibited conspiracy, and however diverse its objects it violates but a single statute . . . . For such a violation only the single penalty prescribed by the statute can be imposed." *Id.* at 54.

**{37}** *Braverman* also cautioned against defining a conspiracy in terms of the criminal objects that were intended to be accomplished. Rather, "the precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objects." *Id.* at 53.

> Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one.

*Id.*

**{38}** While *Braverman* teaches that the number of prosecutable conspiracies from an evidentiary perspective under the federal conspiracy statute is based on the number of agreements, the opinion does not address how to define the number of agreements and whether this is an issue for the judge or jury. Of course, under the specific facts of *Braverman*, there was no need for the Court to engage in such analysis in light of the government's concession. Accordingly, we turn elsewhere—to jurisdictions outside New Mexico, both state and federal—for guidance on whether the existence of more than one conspiracy is a question of law for the court, or one of fact for the jury to determine.

**{39}** Our review of state cases in this area demonstrates a significant split in authorities.

10

Some states, such as Pennsylvania, have decided that the number of conspiracies is an evidentiary issue for the jury. *See, e.g.*, *Wade v. State*, 581 So. 2d 1255, 1256 (Ala. Crim. App. 1991) ("The problem is a factual one and each case is unique." (internal quotation marks and citation omitted)); *People v. Morocco*, 191 Cal. App. 3d 1449, 1453 (Cal. Ct. App. 1987) ("It is well-settled law that the question whether one or multiple conspiracies are present is a question of fact, to be resolved by a properly instructed jury." (internal quotation marks and citation omitted)); *Commonwealth v. Andrews*, 768 A.2d 309, 314 (Pa. 2001) ("[T]he issue is more properly presented as a challenge to the sufficiency of the evidence, with the facts being reviewed in the light most favorable to the verdict winner."); *Commonwealth v. Marinez*, 777 A.2d 1121, 1125-26 (Pa. Super. Ct. 2001) (same); *Williams v. Commonwealth*, 407 S.E.2d 319, 322 (Va. Ct. App. 1991) ("The question of whether the evidence presented in a single trial establishes the existence of one conspiracy or multiple conspiracies is a factual issue for the jury's determination.").

{40}    In contrast, other states such as Washington have determined that multiple conspiracies raise double jeopardy concerns—questions of law for the court. *See, e.g.*, *State v. Pham*, 136 P.3d 919, 934-35 (Kan. 2006) ("[W]hether convictions are multiplicitous is a question of law subject to unlimited review."); *State v. Day*, 925 A.2d 962, 976 (R.I. 2007) ("In cases such as this, where a defendant has been charged with multiple conspiracies but only one exists in actuality, in order to safeguard the defendant's constitutional right not to be placed in double jeopardy, he or she should be sentenced with respect to only one of the counts with the other count(s) being dismissed."); *State v. Johnson*, 371 S.E.2d 340, 352 (W. Va. 1988) ("[T]he defendant's conviction of two conspiracy offenses constituted a violation of the . . . established double jeopardy principles."); *State v. Bobic*, 996 P.2d 610, 617-20 (Wash. 2000) (explaining that convictions for more than one count of conspiracy is a double jeopardy unit of prosecution problem).

{41}    A review of federal case law reveals a greater uniformity among the federal circuits than among the states. The federal circuits frame challenges to multiple conspiracy convictions as constitutional matters that must be resolved by the court as a matter of law.[1]

---

[1]Under federal case law, the multiple conspiracy issue is occasionally raised in the context of a variance defense. "A variance [defense] arises when an indictment charges a single conspiracy but the evidence presented at trial proves only the existence of multiple conspiracies." *United States v. Carnagie*, 533 F.3d 1231, 1237 (10th Cir. 2008). Asserting a variance following conviction on a single count of conspiracy permits a defendant to defeat criminal liability by arguing that, although he belonged to multiple uncharged conspiracies, he did not take part in the conspiracy alleged at trial. *See United States v. Abbamonte*, 759 F.2d 1065, 1068 (2d Cir. 1985), *overruled on other ground by United States v. Macchia*, 41 F.3d 35, 39 (2d Cir. 1994). As opposed to double jeopardy claims, the existence of a variance is a question of fact for the jury. *See* Ninth Circuit *Manual of Model Criminal Jury Instructions, Multiple Conspiracies* § 8.22 (2010 ed.), *available at* http://207.41.19.15/web/sdocuments.nsf/ddfcae883f401d45882576f100661bbb/1c90435a

11

*See United States v. Singleton*, 177 F. Supp. 2d 12, 21 (D.D.C. 2001); William H. Theis, *The Double Jeopardy Defense and Multiple Prosecutions For Conspiracy*, 49 SMU L. Rev. 269, 299 n.159, 306-07 (1996). Federal circuits have adopted this position, in part, because the "[t]he Double Jeopardy Clause prohibits subdivision of a single criminal conspiracy into multiple violations of one conspiracy statute." *United States v. Montgomery*, 150 F.3d 983, 989 (9th Cir. 1998) (internal quotation marks and citation omitted); *see also United States v. Daniels*, 857 F.2d 1392, 1393 (10th Cir. 1988) ("[I]f two charges of conspiracy are in fact based on a defendant's participation in a single conspiracy, the [double] jeopardy clause bars the second prosecution.").[2]

**{42}**     Every federal circuit to have considered this issue, except the Tenth Circuit, applies a multi-factor "totality of the circumstances" test for the court to determine "whether there are two agreements or only one," and hence several conspiracies or one. *United States v. Rigas*, 605 F.3d 194, 213 (3d Cir. 2010) (internal quotation marks and citation omitted); *cf. United States v. Sasser*, 974 F.2d 1544, 1549 n.4 (10th Cir. 1992). Among the factors used by the federal circuits to analyze the number of agreements are whether:

> (a) the [location] of the two alleged conspiracies is the same; (b) there is a significant degree of temporal overlap between the two conspiracies charged; (c) there is an overlap of personnel between the two conspiracies (including unindicted as well as indicted coconspirators); and (d) the overt acts charged and [(e)] the role played by the defendant . . . [in the alleged conspiracies are] similar.

---

46b389358825773f005e73d9?OpenDocument; Tenth Circuit *Criminal Pattern Jury Instructions* No. 2.20 (2005 ed.)*, available at http://federalcriminaljuryinstru*ctions.com/uploads/10th_Circuit_Jury_Instructions_Criminal_2006_PDF.pdf.

[2]In federal court, multiple conspiracies most frequently present in the context of successive conspiracy prosecutions. *See, e.g.*, *United States v. Korfant*, 771 F.2d 660, 662 (2d Cir. 1985); *United States v. Dortch*, 5 F.3d 1056, 1061-64 (7th Cir. 1993). However, the U.S. Supreme Court has repeatedly noted that whether a defendant is subject to multiple punishments for the same offense does not depend upon whether the charges were brought at a single trial or a successive trial. *See Frazier*, 2007-NMSC-032, ¶ 47 n.2 (Chavez, C.J., specially concurring). "If two offenses are the same . . . for purposes of barring consecutive sentences at a single trial, they necessarily will be the same for purposes of barring successive prosecutions." *Brown v. Ohio*, 432 U.S. 161 (1977). "We have often noted that the [Double Jeopardy] Clause serves the function of preventing both successive punishment and successive prosecution, but there is no authority . . . for the proposition that it has different meanings in the two contexts." *United States v. Dixon*, 509 U.S. 688, 704 (1993) (citations omitted).

*Rigas*, 605 F.3d at 213 (first and second alterations in original) (quoting *United States v. Liotard*, 817 F.2d 1074, 1078 (3d Cir. 1987)); *see* Susan R. Klein & Katherine P. Chiarello, *Successive Prosecutions and Compound Criminal Statutes: A Functional Test*, 77 Tex. L. Rev. 333, 348-49 (1998). The Third Circuit asks several related questions, including "(1) whether there was a common goal among the conspirators; (2) whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators; and (3) the extent to which the participants overlap in the various dealings." *Rigas*, 605 F.3d at 213 (internal quotation marks and citation omitted)).

{43} With this background in mind, we proceed to the question at hand. Should New Mexico treat multiple conspiracies merely as an issue of evidentiary sufficiency, or should unit of prosecution principles apply as well? First, it is not readily apparent why the crime of conspiracy should remain an outlier from our double jeopardy jurisprudence. We have consistently applied unit of prosecution principles to criminal statutes as far flung as attempt, *Bernal*, 2006-NMSC-050, ¶¶ 13-31; child abuse, *State v. Castaneda*, 2001-NMCA-052, ¶¶ 12-18,130 N.M. 679, 30 P.3d 368; and defacing tombs, *State v. Morro*, 1999-NMCA-118, ¶¶ 7-26, 127 N.M. 763, 987 P.2d 420; and presumably conspiracy should be no different. We are unable to offer any principled basis for isolating conspiracy from all other criminal statutes.

{44} Second, given the nature of conspiracy, good reason exists for our courts to take greater precautions and exercise more judicial oversight when presiding over multiple conspiracy prosecutions. We are mindful of former U.S. Supreme Court Justice Robert Jackson's admonition more than sixty years ago:

> The modern crime of conspiracy is so vague that it almost defies definition. . . . It sounds historical undertones of treachery, secret plotting and violence on a scale that menaces social stability and the security of the state itself. . . . However, even when appropriately invoked, the looseness and pliability of the doctrine present inherent dangers which should be in the background of judicial thought . . . .

*Krulewitch v. United States*, 336 U.S. 440, 446-49 (1949) (Jackson, J., concurring). Numerous scholars have likewise criticized conspiracy as overly vague, such that the nature of the crime creates a distinct advantage for the prosecution over the accused. *See* 2 Wayne R. LaFave, *Substantive Criminal Law* § 12.1(b)(1), at 256-57 (2d ed. 2003) (describing the various scholarly critiques of conspiracy law).

{45} For instance, "[a] conspiracy is complete when the agreement is reached." *State v. Villalobos*, 120 N.M. 694, 697, 905 P.2d 732, 735 (Ct. App. 1995); *see also State v. Lopez*, 2007-NMSC-049, ¶ 21, 142 N.M. 613, 168 P.3d 743 (noting that New Mexico does not require proof of an overt act). Yet, "[b]ecause most conspiracies are clandestine in nature, the prosecution is seldom able to present direct evidence of the agreement." 2 LaFave, *supra*

13

§ 12.2(a), at 267. The jury may therefore infer the existence of an agreement based on the defendant's conduct and surrounding circumstances, which raises at least the specter of conviction by guess and speculation. *See generally Ross*, 86 N.M. at 214, 521 P.2d at 1163.

**{46}** Conspiracy is also described as a continuing crime. *Villalobos*, 120 N.M. at 697, 905 P.2d at 735. "A single conspiracy can last for years, with many of its substantive offenses being completed during that time . . . ." *Pham*, 136 P.3d at 939. It ends only when "the purposes of the conspiracy have been accomplished or abandoned." *United States v. Eppolito*, 543 F.3d 25, 47 (2d Cir. 2008) (internal quotation marks and citation omitted). Furthermore, a conspiracy may "mature and expand" over time, adding more members and embracing additional criminal objectives without changing the fundamental nature of the single agreement. *See State v. Orgain*, 115 N.M. 123, 129, 847 P.2d 1377, 1383 (Ct. App. 1993) (Hartz, J., specially concurring) ("[A] single conspiracy may mature and expand as more conspirators and objectives are added."); *see also United States v. Rabinowich*, 238 U.S. 78, 86 (1915) ("[A] single conspiracy might have for its object the violation of two or more of the criminal laws."); Model Penal Code § 5.03, cmt. (1985) ("[T]he original agreement subsequently came to 'embrace' additional objects.").

**{47}** These characteristics of conspiracy do not impugn its validity. They do, however, underscore the need for judicial vigilance, since courts are in the best position to assure that multiple conspiracies and their underlying agreements are sufficiently distinct that the accused is not twice placed in jeopardy for the same offense. Given the "inherent dangers" and the "looseness and pliability" of conspiracy noted by Justice Jackson, it is particularly important that the judiciary embrace its unique responsibility to assure the basic fairness and adherence to legislative intent that only the courts can afford.

**{48}** Parenthetically, it is worth observing that the amount of deference our earlier cases granted the jury cannot be justified in light of how the jury is instructed. Under cases such as *Ross* and *Sanders*, we review the jury's determination of one or more agreements for sufficiency of the evidence, yet we do not provide the jury with a multiple conspiracy instruction. We do not explain to the jury that each conspiracy conviction must be supported by evidence of a distinct agreement beyond a reasonable doubt. Nor do we provide the jury with guidance on how to differentiate between agreements. Essentially, we have been deferring to the decision of the jury without ever asking the jury the necessary questions.

**{49}** This approach has invited needless confusion. When the jury is not explicitly instructed that multiple conspiracy convictions require multiple agreements, we run the risk of conflating the existence of multiple conspiracies with the existence of multiple objectives—not multiple agreements—contrary to the holding in *Braverman*. *See United States v. Mallah*, 503 F.2d 971, 985 (2d Cir. 1974), *cert. denied*, 420 U.S. 995 (1975) ("[M]easuring only overt acts provides no protection against carving one larger conspiracy into smaller separate [conspiracies].").

**{50}** Accordingly, whether a defendant has entered into one or more conspiracies

14

inevitably presents a double jeopardy question. Of course, once past the unit of prosecution test, a properly instructed jury must still find, subject to our traditional deferential review, that substantial evidence supports each separate conspiracy.

**{51}** We now turn to the particular facts and circumstances of the case before us and begin our unit of prosecution analysis. As a constitutional matter, our courts apply double jeopardy analysis as a matter of law. *State v. Saiz*, 2008-NMSC-048, ¶ 22, 144 N.M. 663, 191 P.3d 521 ("Double jeopardy presents a question of law, which we review de novo." (citing *Bernal*, 2006-NMSC-050, ¶ 6), *abrogated by State v. Belanger*, 2009-NMSC-025, ¶ 36 n.1, 146 N.M. 357, 210 P.3d 783; *see also State v. Rodriguez*, 2006-NMSC-018, ¶ 3, 139 N.M. 450, 134 P.3d 737 ("We generally review double jeopardy claims de novo. However, where factual issues are intertwined with the double jeopardy analysis, we review the trial court's fact determinations under a deferential substantial evidence standard of review." (citations omitted)). The first question we generally ask is whether the "statutory language spells out the unit of prosecution . . . ." *Bernal*, 2006-NMSC-050, ¶ 14. "If the statutory language for [conspiracy] were clear regarding the unit of prosecution, then the language would control, and the . . . analysis would be complete." *Id.* ¶ 19. New Mexico's conspiracy statute reads: "Conspiracy consists of knowingly combining with another for the purpose of committing a felony within or without this state." Section 30-28-2. In Subsection B, the appropriate level of punishment has been set at the "highest crime conspired to be committed." Section 30-28-2(B).

**{52}** While our case law makes clear that the "gist" of any conspiracy is the agreement, the plain language of the statute defines the crime in terms of the act of "combining" without specifically requiring an agreement. While it appears, based on the plain language of the statute, that our Legislature intended to define the unit of prosecution for conspiracy in terms of the number of conspiratorial combinations, case law teaches that the unit of prosecution for conspiracy is more properly framed in terms of an agreement. It is difficult to say what difference there is, if any, between a combination and agreement. However, irrespective of whether we refer to the prosecutable unit as a combination or as an agreement, the statutory language evinces a clear intent on the part of the Legislature to follow the rule set forth in *Braverman* and reject a definition that focuses on the criminal objectives of the agreement, i.e., the individual crimes that each combination or agreement sets out to accomplish.

**{53}** It is also worth observing that the Legislature in 1979 amended the conspiracy statute to add Subsection B, which prescribes only one increasingly severe punishment for a conspiracy conviction regardless of the number of underlying crimes that may be the objectives of that agreement. *Compare* § 30-28-2(B), *with* 1963 N.M. Laws, ch. 303, § 28-2. The one punishment is calibrated at the level of the "highest crime to be committed" pursuant to the one conspiracy. For example, a conspiracy to commit first-degree murder and other lesser crimes would be punished as one second-degree felony. If the highest level of crime under the conspiracy is a second-degree felony, the conspiracy is punished as a third-degree felony, and so forth. Prior to amendment, conspiracy was punished as a lesser fourth-degree felony no matter how diverse its criminal objects.

15

**{54}** By amending the statute to set punishment at the highest crime, it is reasonable to assume that the Legislature foresaw that in many, if not most, cases there would be a single combination or agreement, and a single punishment, regardless of how many underlying criminal objectives were envisioned. Indeed, the statute would not contemplate a "highest" penalty unless the Legislature determined that a single conspiracy could encompass committing a multitude of crimes.

**{55}** Based on the foregoing principles, a fair inference to draw from the text, history, and purpose of our conspiracy statute is that the Legislature established what we will call a rebuttable presumption that multiple crimes are the object of only one, overarching, conspiratorial agreement subject to one, severe punishment set at the highest crime conspired to be committed. At trial, the state has an opportunity to overcome the Legislature's presumption of singularity, but doing so requires the state to carry a heavy burden.

**{56}** The totality of the circumstances test utilized by the federal circuits is the best mechanism to determine the exceptional instances in which the Legislature's presumption of singularity may be overcome by demonstrating the existence of more than one conspiracy. This multi-factored approach most appropriately tracks the specific language of our statute and the special considerations that inform the crime of conspiracy.[3]

**{57}** When applied to the case at hand, it becomes clear that the State cannot rebut the presumption that Defendant entered into only one agreement and took part in only one conspiracy. First, the three charged conspiracies involve only one victim. Not only is there one victim, but each charged conspiracy intended to inflict a similar type of harm upon that victim. To be convicted of conspiracy, the jury found that Defendant possessed the intent to commit the substantive offense that was the object of the conspiracy. *See Varela*, 1999-NMSC-045, ¶ 42. For conspiracy to commit kidnapping, the jury found that Defendant "intended to hold [Victim] against [his] will: to inflict death or physical injury." *See* § 30-4-1. For conspiracy to commit first-degree murder, the jury found that Defendant's "deliberate intent" was to kill Victim. *See* § 30-2-1(A). For conspiracy to commit aggravated arson, the jury found that Defendant intended to burn Victim's car, causing him great bodily harm. *See* § 30-17-6. That each charged conspiracy required Defendant and his confederates to contemplate inflicting great bodily harm or death upon the same individual strikes us as "a strong indicator of legislative intent," *Bernal*, 2006-NMSC-050, ¶ 18, to impose no more than one, severe punishment set by statute at the "highest crime to be committed," § 30-28-2(B).

---

[3]One of the federal factors analyzes the nature of the overt acts committed by conspiracy participants. *See, e.g., Rigas*, 605 F.3d at 213. While New Mexico law does not require the existence of an overt act, our courts may still rely on this factor to help determine whether a defendant entered into one or more conspiratorial agreements.

16

**{58}** The relatively short time frame also supports the existence of one conspiracy. The entire series of events, from the fight at the bar up through the murder by arson, took place between the hours of midnight and seven in the morning of September 7, 2003. While a six- to eight-hour time frame might support a finding of distinctness in the context of other crimes, the time frame for conspiracy depends upon the unique nature of the crime.

**{59}** Conspiracy was criminalized to address "the special and continuing dangers incident to group activity." 2 LaFave, *supra* § 12.1, at 254. Conspiracy is also an inchoate crime, developed as "a means for preventive intervention against persons who manifest a disposition to criminality" without necessarily ever committing the underlying crime which is the object of the agreement. 2 LaFave, *supra* § 12.1(c), at 263; *see also Boyle v. United States*, __ U.S. __, __, 129 S. Ct. 2237, 2246 (2009) ("[A] conspiracy is an inchoate crime that may be completed in the brief period needed for the formation of the agreement and the commission of a single overt act in furtherance of the conspiracy.").

**{60}** Because the crime is characterized by multiple individuals who have agreed to achieve illegal objectives, a single conspiracy may take longer to develop than crimes such as criminal sexual penetration, robbery, or shooting at a motor vehicle, where group activity is not inherent to the offense and where planning and consensus building are less relevant. Under the facts presented here, we think that the modest time line, which was continuous and undisturbed by any intervening event, strongly suggests that Defendant and his co-conspirators formed one overarching agreement, rather than three distinct agreements, separated by time and space.

**{61}** Another factor that points to the existence of a single conspiratorial combination is that the actions of all conspirators were overlapping and mutually dependent. The same conspirators are implicated in all three charged conspiracies, and without their concerted action and continued communication, none of the substantive crimes would have otherwise taken place.

**{62}** Finally, it is unclear how this Court can meaningfully distinguish between the three charged conspiracies in a way that would justify multiple punishment under the conspiracy statute. For instance, even if we credit Defendant's argument that he was unaware of the plot to murder while taking part in the initial kidnapping, it does not follow that Defendant entered a new combination when he later joined his confederates in their efforts to kill.[4]

---

[4]As we have previously indicated, a reasonable inference that the jury could have drawn from the evidence is that Defendant and his confederates held Victim against his will with the understanding that he was to be killed later that evening. According to this view of the evidence, the conspiracy to commit kidnapping was subsumed within the scheme to kill because an intent to kill was fully formed by the time the kidnapping occurred. In other words, we would be justified in concluding, in the alternative, that the conspiracy to commit kidnapping was a "necessary immediate step" to the conspiracy to commit murder. *See*

Such a finding would be contrary to the plain language of our conspiracy statute, which punishes the act of combining with another, not the objects that were to be committed, and contrary to the holding in *Braverman*, which adopted a similar rationale. That the same agreement evolved over time to embrace a murderous new objective upon the introduction of Michelle Martinez and her heroin overdose did not create a new crime but simply added a new objective to the same criminal combination. Because the objectives of a single agreement may change over time without such changes creating a new agreement, the conspiracy to commit kidnapping should be understood as one aspect of a larger continuous combination that eventually embraced murder as its central objective. *Orgain*, 115 N.M. at 129, 847 P.2d at 1383 (Hartz, J., specially concurring). Under the terms of our statute, the addition of this objective would justify greater liability, but only insofar as first-degree murder is now the "highest crime conspired to be committed." Section 30-28-2(B). The agreement, and hence the combination, would remain the same.

{63}     In a similar sense, the conspiracy to commit aggravated arson is subsumed within the larger agreement. By the time Defendant and Tollardo left Elias Romero's shack to burn Victim alive, there had been numerous attempts on Victim's life, all of which were unsuccessful or not yet fully effective. The fact that Defendant and his hapless confederates decided to light Victim on fire after their previous attempts to kill—a heroin overdose, a broken neck, and strangulation—had proven ineffective was not tantamount to forming an additional agreement to kill by use of fire. Their actions did not create a new criminal combination.

{64}     We are persuaded that this is the type of routine case on which the Legislature clearly intended to impose one punishment. Because the State cannot overcome the strong presumption of singularity embodied in the conspiracy statute, we conclude that the Legislature did not intend to allow multiple punishments in this case. We have held that double jeopardy problems are not cured "by the trial court imposing concurrent sentences for the multiple convictions" because "a separate conviction is itself punishment that has potential adverse consequences." *Barr*, 1999-NMCA-081, ¶ 12 (citing *Pierce*, 110 N.M. at 87, 792 P.2d at 419). For this reason, the appropriate remedy is to vacate Defendant's redundant convictions with punishment imposed on the single remaining conspiracy at the level of the "highest crime conspired to be committed," which is a conspiracy to commit first-degree murder. *See* § 30-28-2(B). Accordingly, we remand this case to the district court to vacate Defendant's convictions for conspiracy to commit kidnapping and conspiracy to commit aggravated arson and resentence Defendant in a manner consistent with this Opinion.

---

*Andrews*, 768 A.2d at 316-17 (discussing *Commonwealth v. Richbourg*, 394 A.2d 1007, 1011 (Pa. Super. Ct. 1978), where a conspiracy to commit robbery was a "necessary intermediate step" to a conspiracy to commit burglary, because the "robbery was committed for the purpose of obtaining keys to a restaurant that was later burglarized").

**Request for a Continuance to Secure the Presence of Defense Witnesses**

**{65}** Defendant claims the district court erred by refusing to grant a continuance to secure the attendance of two defense witnesses at trial. Those witnesses are Kami Ramsey, a guard at the Cibola County Detention Center during Michelle Martinez's incarceration at that facility, and Surtina Cohoe, Martinez's former cell mate at the Cibola County facility. The court ultimately read their testimony to the jury in the form of a stipulation which the parties jointly drafted. We review Defendant's claim for an abuse of discretion. *See State v. Salazar*, 2007-NMSC-004, ¶ 10, 141 N.M. 148, 152 P.3d 135 ("The grant or denial of a continuance is within the sound discretion of the trial court, and the burden of establishing abuse of discretion rests with the defendant.").

**{66}** Both parties agree that our opinion in *State v. Torres*, 1999-NMSC-010, 127 N.M. 20, 976 P.2d 20, controls. In *Torres,* we promulgated a number of factors for courts to consider when evaluating a motion for a continuance. *Id.* ¶ 10. These factors include "the length of the requested delay, the likelihood that a delay would accomplish the movant's objectives, the existence of previous continuances in the same matter, the degree of inconvenience to the parties and the court, the legitimacy of the motives in requesting the delay, the fault of the movant in causing a need for the delay, and the prejudice to the movant in denying the motion." *Id.*

**{67}** In applying the *Torres* factors to the present case, we conclude that the district court did not abuse its discretion in denying Defendant's motion for a continuance. When prompted, defense counsel could not provide the court with an estimate for the amount of time needed to bring either Ramsey or Cohoe to court. Nor did counsel attempt to explain why granting a continuance would likely result in their ultimate appearance. Regarding the degree of inconvenience, by the time defense counsel motioned the court for a continuance on the third day of the three-day trial, the State had already called its final witness, and one of the two alternate jurors had been excused.

**{68}** The district court properly ascribed fault to defense counsel in creating the need for a delay. The district court raised significant questions about whether the witnesses had been properly subpoenaed. While defense counsel insisted that his investigator was prepared to testify as to service of process, the court's offer of a stipulation was accepted without counsel ever providing proof of service. Regarding Cohoe, even assuming she was properly served, defense counsel did not timely notify the court that Cohoe had failed to appear on the appropriate subpoena date. This was a particularly egregious oversight in light of defense counsel's repeated assurances that Cohoe was reliable and trustworthy and would show up to testify as she promised. The court was justified in holding defense counsel accountable for creating the need for a delay to secure Ramsey's attendance. On the first day of trial, defense counsel refused the court's offer to issue a warrant and admitted that Ramsey's testimony was not sufficiently important to justify any kind of delay.

**{69}** As to the final *Torres* factor—prejudice—Defendant argues that Cohoe's live

19

testimony was vital to his defense, as she was prepared to refute Martinez's version of events and undercut her credibility. Despite these contentions, Defendant cannot show how Cohoe's live testimony would have differed from what was presented by stipulation. In addition, as Martinez's cell mate, Cohoe had credibility problems of her own; even her stipulated testimony was subject to character-based impeachment by way of her prior convictions.

{70}    Finally, Cohoe's testimony was cumulative. The record reveals that defense counsel attacked Martinez's credibility throughout the trial. Specifically, Defendant demonstrated that Martinez had changed her story several times, she had committed numerous crimes of dishonesty, she had accepted a generous plea deal, she had engaged in a litany of related misdeeds, and she had a reputation in jail for lying. In light of the voluminous evidence presented on Martinez's credibility, including the stipulated testimony itself, we cannot conclude that Defendant was prejudiced by his inability to present live testimony from either Ramsey or Cohoe.

**Improbability of Michelle Martinez's Testimony as a Matter of Law**

{71}    Defendant argues that Michelle Martinez's uncorroborated testimony is inherently improbable as a matter of law. *See State v. Trujillo*, 60 N.M. 277, 291, 291 P.2d 315, 319 (1955) ("an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable" (internal quotation marks and citation omitted)); *State v. Boyd*, 84 N.M. 290, 292, 502 P.2d 315, 317 (Ct. App. 1972) ("The rule is that testimony is not inherently improbable unless what is claimed to have occurred could not in fact have occurred.").

{72}    Notwithstanding Defendant's position, any potential inconsistencies in Martinez's testimony or questions regarding her veracity do not justify reversal, since weighing the evidence, like credibility determinations, falls within the "exclusive province of the jury." *Orgain*, 115 N.M. at 126, 847 P.2d at 1380. Furthermore, even assuming Martinez's testimony was improbable, the record contains ample evidence that independently corroborates Martinez's version of events.

**Defendant's Motion for a New Trial**

{73}    The district court denied Defendant's motion for a new trial based on newly discovered evidence. In general, "we will not disturb a trial court's exercise of discretion in denying or granting a motion for a new trial unless there is a manifest abuse of discretion." *See State v. Garcia*, 2005-NMSC-038, ¶ 7, 138 N.M. 659, 125 P.3d 638. A motion for new trial based on newly discovered evidence may be properly granted where the newly discovered evidence: (1) "will probably change the result if a new trial is granted," (2) "must have been discovered since the trial," (3) "could not have been discovered before the trial by the exercise of due diligence," (4) "must be material," (5) "must not be merely cumulative, and" (6) "must not be merely impeaching or contradictory." *Id.* ¶ 8 (internal

20

quotation marks and citation omitted).

**{74}** The alleged newly discovered evidence is that Michelle Martinez committed perjury at Elias Romero's criminal trial. According to Defendant, Martinez admitted to lying about the color and type of gun that Elias Romero was known to possess. Since the district court did not have access to the transcript of Martinez's perjurious testimony when it denied Defendant's motion for a new trial, Defendant claims that the district court could not have properly evaluated this new evidence. Defendant requests that we order a remand for the district court to conduct a more searching review of Martinez's testimony during Elias Romero's trial.

**{75}** We reject Defendant's claim. Defendant cannot show why the district court needed Elias Romero's trial transcript before it could rule on his motion for a new trial. Defendant never asked the district court to consider the transcript and never disputed the district court's characterization of Martinez's testimony.

**{76}** In any event, the newly discovered evidence fails to satisfy many of the factors set forth in *Garcia*. First, the newly discovered evidence is not substantive, as Martinez's perjury is "merely impeaching." In addition, Defendant cannot explain why a new jury would likely reach a different result based on new evidence, when a description of Elias Romero's gun is not material to Defendant's case. Martinez did *not* admit to lying about Defendant's degree of involvement in the crime. Finally, the newly discovered evidence is cumulative. In light of Defendant's sustained attacks against Martinez at trial, we are unpersuaded that impeaching her credibility with this new act of perjury would have provided the jury with information that it had not already heard.

**{77}** Given the wide latitude we provide to district courts in resolving motions for a new trial based on newly discovered evidence, we cannot conclude that an abuse of discretion occurred on these facts. *See State v. Sosa*, 1997-NMSC-032, ¶ 16, 123 N.M. 564, 943 P.2d 1017 (explaining that motions for a new trial based on newly discovered evidence are "not encouraged" and the "denial of such a motion will only be reversed if the district court has acted arbitrarily, capriciously, or beyond reason").

**CONCLUSION**

**{78}** Accordingly, we affirm in part, reverse in part, and remand to the district court for further proceedings.

**{79}** **IT IS SO ORDERED.**

_____
**RICHARD C. BOSSON, Justice**

21

**WE CONCUR:**

_____

**CHARLES W. DANIELS, Chief Justice**


_____

**PATRICIO M. SERNA, Justice**


_____

**PETRA JIMENEZ MAES, Justice**


_____

**EDWARD L. CHÁVEZ, Justice**

**Topic Index for *State v. Gallegos*, Docket No. 31,204**

| | |
|---|---|
| **CT** | **CONSTITUTIONAL LAW** |
| CT-DJ | Double Jeopardy |
| | |
| **CL** | **CRIMINAL LAW** |
| CL-AR | Arson |
| CL-CF | Capital Felony |
| CL-HO | Homicide |
| CL-CS | Conspiracy |
| CL-KP | Kidnapping |
| CL-MU | Murder |
| CL-UC | Unitary Conduct |
| | |
| **CA** | **CRIMINAL PROCEDURE** |
| CA-DJ | Double Jeopardy |
| CA-SE | Substantial or Sufficient Evidence |