This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                                          NO.  30,115

**MATTHEW HEPPLE**,

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF VALENCIA COUNTY**
**John W. Pope, District Judge**

Gary K.  King, Attorney General
Yvonne M. Chicoine, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Acting Chief Public Defender
Karl Erich Martell, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**GARCIA, Judge.**

Defendant Matthew Hepple appeals his convictions for two counts of first

degree kidnapping, one count of conspiracy to commit kidnapping, and one count of conspiracy to commit child abuse. Defendant's wife, Sarah Burton-Hepple, was tried jointly with Defendant and was convicted of the same crimes. Defendant raises eight issues on appeal. Defendant challenges the propriety of the jury instructions, the district court's evidentiary rulings, the sufficiency of the evidence, and argues that his convictions were inconsistent and violated double jeopardy protections. We affirm in part and reverse in part.

**BACKGROUND**

In early 2006, Defendant and his wife (collectively, the Hepples) rented a home in Laguna, New Mexico. At that time, the Hepples had six children. The two oldest children, Rikki and Joseph, were Defendant's stepchildren. Rikki was twelve years old and Joseph was eight years old.

A few months after arriving in New Mexico, the Hepples began using handcuffs and ropes to restrain Rikki and Joseph for up to a week at a time. The Hepples restrained Rikki and Joseph in either the bathroom or in a room identified as the "animal room," which functioned as both a den and as Rikki's bedroom. The animal room had a six-by-six inch wooden pillar in its center that went from the floor to the ceiling. The pillar was used as a secure post where Rikki and Joseph would be tied up. While restrained, the children often went without food and were not allowed to

use the toilet.

Rikki believed that the Hepples were restraining her as a form of punishment. She said that the Hepples told her they were binding her because she was hurting her siblings. The Hepples also accused Rikki of stealing food and pain medications. Defendant told his neighbor that animals and children were similar because they will work for food if it is withheld from them. The Hepples' property manager saw a latch for a lock located on the refrigerator door. Rikki denied hurting her siblings and stealing pain medications, but she admitted that she would try to steal food, and she would eat out of the garbage can when she was starving. The Hepples never told Joseph why they restrained him.

Rikki and Joseph both looked very skinny and appeared unhealthy. Rikki had scars on her arms that appeared like someone gouged her with a knife or burned her. Joseph also had sores and scars on his arms. They kept their hair short because of head lice, and usually wore long-sleeved shirts and long pants. The Hepples told people that Rikki was detoxing from an addiction to cough medicine and that she was addicted to all kinds of pills.

On May 10, 2007, Rikki and Joseph were tied to the animal room pillar. Sometime after 6:30 a.m., Rikki used her teeth to untie the ropes binding her wrists and escaped out a window. Rikki believed that she would be too weak to walk if she

stayed much longer. Joseph woke that morning to find Rikki gone, the animal room window open, and the ropes binding him to the pillar loosened. The Hepples moved within three days of Rikki's escape from the home.

After she escaped, Rikki hitchhiked to the Starlight movie theater in Los Lunas, New Mexico. She arrived at approximately noon and spoke to Nicole Padilla. Rikki was very hungry, dirty, and pale, with dark circles under her eyes. She smelled of urine, feces, and body odor. Nicole Padilla called her mother, who purchased food, clothing, and a new knapsack for Ricki. Sarah Burton-Hepple had told the local police that Rikki had walked away from the house taking three knives with her. The Padillas did not see any knives when they helped Rikki transfer her belongings to her new knapsack.

At approximately 5:00 p.m. that evening, the Padillas contacted the police. After the police were contacted, CYFD took Rikki into custody. Rikki lied to CYFD about her identity and about the origins of her injuries. As a result, Rikki was not correctly identified until May 31, 2007. Joseph was later removed from the Hepples' new home. When asked if he wanted to go back and live with his parents, Joseph told CYFD that he would only want to see them with a lot of police around.

On July 5, 2007, the Hepples were indicted on two counts of kidnapping and seventy-three counts of child abuse. A superseding indictment in November 2007

4

charged the Hepples with two counts of kidnapping, conspiracy to commit kidnapping, four counts of intentional child abuse resulting in great bodily harm, conspiracy to commit intentional child abuse, and two counts of negligently causing child abuse. All charges were based on events occurring between January 1, 2006, and May 10, 2007. After two continuances, trial was set for the week of November 10, 2008.

During trial, Rikki and Joseph testified regarding their confinement, injuries, and resulting scars. Their testimony included explanations as to why they had initially lied about their injuries to CYFD and the police. The State also presented testimony from two expert witnesses, Dr. Ian Paul and Dr. Karen Campbell. The district court qualified Dr. Campbell to testify as an expert in forensic pediatrics and general medicine, over an objection by the defense. Dr. Campbell testified regarding Joseph's injuries. Dr. Paul, a forensic pathologist, discussed the nature of Rikki's injuries and their most likely causes. Neither Defendant nor Sarah Burton-Hepple testified during the defense's case-in-chief. The defense focused its final argument on the weaknesses in the State's case and the credibility of its witnesses.

At the close of the State's case, Defendant moved to dismiss the kidnapping charges, arguing that a parent has legal authority over his children and cannot kidnap them. Both parties and the district court conceded that they knew of no New Mexico

5

authority addressing the issue. After searching "high and low" for such authority on the issue, the district court found that a parent can kidnap his own child if the parent acts outside his own lawful authority as a parent. As a result, the district court denied Defendant's motions to dismiss the kidnapping charges.

Following trial, the jury found Defendant guilty of kidnapping and conspiracy to commit the kidnapping of Rikki and Joseph, and conspiracy to commit intentional child abuse. The jury returned special verdict forms finding that Defendant had not voluntarily released the children in a safe location and that neither child had suffered great bodily harm, and acquitted Defendant of the remaining child abuse offenses. The jury was not provided with an instruction on the statutory unlawfulness element for the kidnapping offenses. Defendant timely filed an appeal of his convictions.

**DISCUSSION**

**A.    The Unlawfulness Element of Kidnapping**

Defendant challenges his kidnapping and conspiracy to commit kidnapping convictions on the grounds that the State failed to prove, and the jury was not instructed on, the essential unlawfulness element of kidnapping. We will first address Defendant's argument that the statutory definition of kidnapping makes it impossible for a parent to kidnap his own child. *See* NMSA 1978, Section 30-4-1(A) (2003). Citing *State v. Franklin*, 78 N.M. 127, 129, 428 P.2d 982, 984 (1967) and *State v.*

6

*Boyer*, 103 N.M. 655, 659, 712 P.2d 1, 5 (Ct. App. 1985), Defendant contends that this Court should reverse his convictions because he was acting in loco parentis and his conduct was a lawful exercise of parental discipline.

We review de novo the question of whether New Mexico's kidnapping statute applies to parents and those acting in loco parentis. *State v. Torres*, 2006-NMCA-106, ¶¶ 5, 8, 140 N.M. 230, 141 P.3d 1284. When construing statutes, we look to the plain language of the statute with the primary goal of giving effect to the intent of the Legislature. *Att'y Gen. of N.M. v. N.M. Pub. Regulation Comm'n*, 2011-NMSC-034, ¶ 10, 150 N.M.174, 258 P.3d 453. Statutes in para materia are harmonized and construed together, under a presumption that the Legislature acts with full knowledge of relevant statutory and common law. *Id.* We begin our analysis with the language of Section 30-4-1(A), which codifies the criminal offense of kidnapping.

New Mexico defines kidnapping as:

> the *unlawful* taking, restraining, transporting or confining of a person, by force, intimidation or deception, with intent: (1) that the victim be held for ransom; (2) that the victim be held as a hostage or shield and confined against his will; (3) that the victim be held to service against the victim's will; or (4) to inflict death, physical injury or a sexual offense on the victim.

Section 30-4-1(A)(1)-(4) (emphasis added). The unambiguous language of the statute does not exempt a parent from criminal liability for kidnapping his or her own child. As a result, we must determine whether the Legislature otherwise intended to exempt

7

a parent from criminal liability for kidnapping his or her own child.

We recognize that a parent in New Mexico, "has a privilege to use moderate or reasonable physical force, without criminal liability, when engaged in the discipline of his or her child." *State v. Lefevre*, 2005-NMCA-101, ¶ 16, 138 N.M. 174, 117 P.3d 980. But if it is to be justified, a parent's exercise of the parental discipline privilege must not be cruel or excessive. *Id.* As such, the uniform jury instruction defining unlawful conduct specifically exempts *non-abusive* parental or custodial care from classification as unlawful. *See* UJI 14-132 NMRA; *see also Lefevre*, 2005-NMCA-101, ¶ 16 ("The parent's conduct is to be measured under an objective standard."). Thus, it would be overly restrictive to construe the kidnapping statute as Defendant suggests.

Harmonizing UJI 14-131 NMRA with the plain language of Section 30-4-1(A), kidnapping by a custodial parent or person acting in loco parentis is legally possible. We conclude that a parent may be found criminally guilty for kidnapping his or her own child when the parent's conduct is determined to be inconsistent with the privilege provided for custodial parental acts, including unlawful restraint or confinement with the intent to inflict physical injury. Having determined this singularly narrow issue that was raised by Defendant in this case, whether a parent can be charged with the offense of kidnapping, we now address Defendant's remaining

8

arguments. Defendant also argues that we must reverse his kidnapping and conspiracy to commit kidnapping convictions because the jury was not instructed on the essential element of unlawfulness and that his conduct was lawful because he was exercising the privilege to discipline his children.

Defendant asserts that the unlawfulness instruction was necessary because he introduced evidence during trial that his behavior constituted the type of lawful parental discipline that is expressly exempted from the definition of unlawful conduct. *See* UJI 14-132. Defendant failed to preserve this error on appeal because he did not tender or argue for the inclusion of the unlawfulness jury instruction. We therefore review his claim for fundamental error. *See State v. Sosa*, 1997-NMSC-032, ¶ 23, 123 N.M. 564, 943 P.2d 1017 ("Having failed to proffer accurate instructions, object to instructions given, or otherwise preserve the issue for appeal, . . . we will limit our evaluation to the claim of fundamental error."); Rule 12-216 NMRA (setting forth the preservation requirements).

> Error that is fundamental must be such error as goes to the foundation or basis of a defendant's rights or must go to the foundation of the case or take from the defendant a right which was essential to his defense and which no court could or ought to permit him to waive.

*State v. Garcia*, 46 N.M. 302, 309, 128 P.2d 459, 462 (1942). If the jury instructions omitted an element which was at issue in the case, the error could be considered fundamental. *State v. Orosco*, 113 N.M. 780, 783, 833 P.2d 1146, 1149 (1992), *aff'd*

9

*in part by State v. Trevino*, 116 N.M. 528, 865 P.2d 1172 (1993). The question, then, "is whether there was any evidence or suggestion in the facts, however slight, that could have put the element of unlawfulness in issue." *Id.* at 784, 833 P.2d at 1150. "Fundamental error requiring reversal occurs when a jury instruction fails to include an essential element of an offense or a defense to a charge, leaving the question of guilt so doubtful that it would shock the conscience to permit the verdict to stand." *Sosa*, 1997-NMSC-032, ¶ 24.

Defendant contends that fundamental error occurred because the jury was presented with evidence that "any alleged tying-up was done in a lawful manner for the purpose of discipline." However, Defendant has not identified any evidence in the record that suggests he used objectively "moderate or reasonable physical force" to confine Rikki and Joseph or that he did so in an effort to discipline them. *See Lefevre*, 2005-NMCA-101, ¶ 16. Instead, Defendant only points this Court to Rikki's testimony that the Hepples told her that they were disciplining her for hurting her siblings. Effectively, Defendant's unsupported argument amounts to an assertion of prejudice, without any showing of prejudice. *See In re Ernesto M., Jr.*, 1996-NMCA-039, ¶ 10, 121 N.M. 562, 915 P.2d 318 ("An assertion of prejudice is not a showing of prejudice."). The mere fact that Defendant now claims that his conduct was for the purpose of discipline does not put the element of unlawfulness at issue. *See Lefevre*,

2005-NMCA-101, ¶¶ 16, 17 (stating that if "a question of parental privilege exists, the [s]tate must prove beyond a reasonable doubt that the parent's conduct did not come within the privilege"). For unlawfulness to be at issue, evidence was required that the disciplinary measures imposed on Rikki and Joseph constituted moderate or reasonable physical force that was warranted under the parental discipline privilege.

"[U]nder the rule of fundamental error[,] reversal is required only when the interests of justice so require." *Orosco*, 113 N.M. at 785, 833 P.2d at 1151. In this case, the State established that (1) Defendant confined Rikki and Joseph for up to a week at a time, during which he denied them food, water, and access to a toilet; and (2) the methods used to bind them resulted in permanent scarring. On appeal, Defendant has failed to point to any evidence that his conduct constituted a lawful exercise of parental care for the purposes of discipline. Further, we see no evidence in the record suggesting that Defendant was exercising moderate or reasonable physical force when he confined Rikki and Joseph. As such, we conclude that the record as to unlawfulness in this case was not disputed, and it was left to the jury to fairly consider at what point Defendant's conduct in confining Rikki and Joseph became unlawful so as to support his conviction for kidnapping. The interests of justice are not violated in this case because Defendant failed to dispute the evidence or the issue of lawfulness at trial.

We recognize Defendant's contention that the jury was presented with testimony and evidence regarding Rikki's credibility and her different version of the events in question. This conflicting evidence does not warrant reversal. We defer to the fact finder's decision when weighing any contradictory evidence and assessing the credibility of the witnesses. *See State v. Sosa*, 2000-NMSC-036, ¶ 8, 129 N.M. 767, 14 P.3d 32 (stating that the "credibility of witnesses is for the jury"); *State v. Riggs*, 114 N.M. 358, 362-63, 838 P.2d 975, 979-80 (1992) (stating that the jury determines questions of credibility and the weight to be given to evidence); *State v. Sutphin*, 107 N.M. 126, 130-31, 753 P.2d 1314, 1318-19 (1988) ("An appellate court does not evaluate the evidence to determine whether some hypothesis could be designed which is consistent with a finding of innocence.").

A reversal of Defendant's conviction would not preserve the interests of justice where no rational jury could have concluded that Defendant committed the acts underlying his kidnapping convictions without also determining that those acts were performed in an excessive or unjustifiable manner that went beyond the reasonable bounds of lawful parental care and custodial discipline. *See Orosco*, 113 N.M. at 784, 833 P.2d at 1150 ("The [district] court's error in failing to instruct on an essential element of a crime for which defendant has been convicted, where there can be no dispute that the element was established, therefore does not require reversal of the

12

conviction."). Therefore, fundamental error has not been established, and we do not reverse Defendant's kidnapping convictions despite the district court's failure to give a specific instruction on unlawfulness. *Id.* at 113 N.M. at 786, 833 P.2d at 1152 ("It cannot be said that every failure to instruct on an essential element necessarily renders a trial fundamentally unfair. We are therefore justified in examining the facts in each case to determine whether the error in the instructions rose to the level of fundamental error so as to justify reversal."). In addition, the evidence of Defendant's unlawful confinement of Rikki and Joseph was sufficiently established in the record at trial.

**B.    Double Jeopardy**

We next address Defendant's contention that his convictions for conspiracy to commit kidnapping and conspiracy to commit intentional child abuse violate double jeopardy protections because the evidence at trial did not support separate conspiratorial agreements to support more than one count of conspiracy. We review the constitutional question of whether there has been a double jeopardy violation de novo. *State v. Andazola*, 2003-NMCA-146, ¶ 14, 134 N.M. 710, 82 P.3d 77. This includes double jeopardy challenges involving multiple conspiracy charges. *State v. Gallegos*, 2011-NMSC-027, ¶¶ 50-51, 149 N.M. 704, 254 P.3d 655. We note, however, that where factual issues are intertwined with the double jeopardy analysis, the factual determinations made during the trial are subject to a deferential substantial

13

evidence standard of review. *State v. Rodriguez*, 2006-NMSC-018, ¶ 3, 139 N.M. 450, 134 P.3d 737.

Defendant argues that double jeopardy was violated because he was charged with multiple violations of the same statute based upon a single course of conduct. *See Gallegos*, 2011-NMSC-027, ¶¶ 28-50 (recognizing the unit of prosecution test for multiple charges under the conspiracy statute); *State v. DeGraff*, 2006-NMSC-011, ¶ 25, 139 N.M. 211, 131 P.3d 61 (holding that there are two types of double jeopardy cases with regard to multiple punishments: (1) when a defendant is charged with multiple violations of the same statute based on a single course of conduct referred to as "unit of prosecution" cases; and (2) when a defendant is charged with violations of multiple statutes for the same conduct referred to as "double-description" cases (internal quotation marks and citation omitted)). It is not disputed that we are dealing with a unit of prosecution case. The State, however, responds that double jeopardy was not violated because "[e]ach decision to bind and release Rikki and Joseph, accompanied by decisions of how to bind them, where to bind them, how long they should remain bound, whether to deny them food and water while bound, and whether to bind them so tightly [that] injury was inescapable, constituted a distinct conspiracy in pursuit of a distinct purpose[.]" Under the facts of this case, we disagree with the State.

A unit of prosecution challenge uses a two-step inquiry. First, we ask whether the unit of prosecution is clearly defined by the statute at issue and, second, whether the charged acts were sufficiently distinct to justify multiple punishments under the same statute. *State v. Swick*, 2012-NMSC-018, ¶ 33, 279 P.3d 747; *State v. Stewart*, 2005-NMCA-126, ¶ 13, 138 N.M. 500, 122 P.3d 1269. In this case, the first inquiry, whether a unit of prosecution is clearly defined in NMSA 1978, Section 30-28-2 (1979), is not at issue. The only issue is whether the acts of conspiracy were sufficiently distinct to justify multiple punishments under the same statute. *State v. Bahney*, 2012-NMCA-039, ¶ 17, 274 P.3d 134 (stating that "if no legislative guidance is apparent, [the court must determine] whether a defendant's acts are separated by sufficient indicia of distinctness to justify multiple punishments under the same statute" (internal quotation marks and citation omitted)), *cert. denied*, 2012-NMCERT-003, (No. 33,448, March 8, 2012).

Under *Gallegos*, we recognize that "the Legislature established what we will call a rebuttable presumption that multiple crimes are the object of only one, overarching, conspiratorial agreement subject to one, severe punishment set at the highest crime conspired to be committed." 2011-NMSC-027, ¶ 55. Our Supreme Court adopted "the totality of the circumstances test utilized by the federal circuits in announcing the nature of evidence required to overcome the presumption." *Bahney*,

15

2012-NMCA-039, ¶ 17 (alternation, internal quotation marks, and citation omitted). The federal test analyzes whether:

> (a) the location of the two alleged conspiracies is the same; (b) there is a significant degree of temporal overlap between the two conspiracies charged; (c) there is an overlap of personnel between the two conspiracies (including unindicted as well as indicted co-conspirators); and (d) the overt acts charged and (e) the role played by the defendant in the alleged conspiracies are similar.

*Gallegos*, 2011-NMSC-027, ¶ 42 (alterations, internal quotation marks, and citation omitted). Where a conspiracy involves a continuing crime, it may last for years and involve numerous substantive offenses that end only when "the purposes of the conspiracy have been accomplished or abandoned." *Id.* ¶ 46 (internal quotation marks and citation omitted). Thus, our first inquiry is to determine "the precise nature and extent" of the agreement between Defendant and Sarah Burton-Hepple that "embraces and defines its object[ives]." *Id.* ¶ 37 (internal quotation marks and citation omitted).

The evidence in this case fails to rebut the presumption that Defendant and his wife had one agreement to continuously bind and restrain Rikki and Joseph in an excessive and unjustifiable manner. With regard to the unlawful confinement of the children, Defendant's actions were an overlapping and continuous series of related events. The fact that the confinement included two victims and occurred over a significant period of time does not on its own rebut the singular conspiracy presumption. Instead, each decision to bind and release Rikki and Joseph, as well as

16

the accompanying decisions related to the details of confinement, occurred in pursuit of a single parental objective, and cannot be meaningfully distinguished in a way that would justify multiple conspiracies under the precedent established in *Gallegos*. We therefore vacate Defendant's conviction for conspiracy to commit intentional child abuse because it was part of the singular conspiracy to excessively confine the children that was also the basis for the more serious conspiracy to commit kidnapping offense.

We next address Defendant's argument, pursuant to *Franklin* and *Boyer*, that one of his convictions for kidnapping and his conviction for conspiracy to commit kidnapping should be vacated on double jeopardy unitary conduct grounds. Defendant's kidnapping convictions involved two victims who suffered separate and distinct harm, and do not violate double jeopardy. *See State v. Bernal*, 2006-NMSC-050, ¶ 20, 140 N.M. 644, 146 P.3d 289; *State v. Barr*, 1999-NMCA-081, ¶ 18, 127 N.M. 504, 984 P.2d 185 (recognizing that the presence of multiple victims is the most salient distinctness factor giving rise to multiple offenses). In addition, Defendant's argument that his conspiracy conviction should have merged with the completed offense is inconsistent with New Mexico law. *See State v. Armijo*, 90 N.M. 12, 15, 558 P.2d 1151, 1154 (Ct. App. 1976). Defendant's argument is without merit, and we will not address it further.

## C.  Sufficiency of the Evidence

We now address Defendant's argument on appeal that there was not sufficient evidence before the jury to support his convictions. In reviewing the sufficiency of the evidence in a criminal case, "we first view the evidence in the light most favorable to the state, resolving all conflicts and indulging all permissible inferences in favor of the verdict." *Gallegos*, 2011-NMSC-027 ¶ 15 (alterations, internal quotation marks, and citations omitted). Then "we must determine whether substantial evidence, either direct or circumstantial, exists to support a verdict of guilty beyond a reasonable doubt for every element essential to a conviction." *State v. Jacobs*, 2000-NMSC-026, ¶ 22, 129 N.M. 448, 10 P.3d 127; *Gallegos*, 2011-NMSC-027, ¶ 15. Appellate courts "do not search for inferences supporting a contrary verdict or re-weigh the evidence." *State v. Graham*, 2005-NMSC-004, ¶ 13, 137 N.M. 197, 109 P.3d 285. We recognize that the jury's fundamental role is that of fact finder and that it is the "responsibility of the courts to ensure the jury's decisions are supportable by evidence in the record, rather than mere guess or conjecture." *Gallegos*, 2011-NMSC-027, ¶ 15 (internal quotation marks and citation omitted).

With regard to Defendant's claim that his convictions were not supported by sufficient evidence, we note that Defendant supports his argument by merely reciting the elements of each convicted offense. Defendant does not further develop this

argument by discussing the evidence presented at trial or its insufficiency to meet the recited statutory elements. While this Court's policy is to refrain from reviewing "unclear or undeveloped arguments which require us to guess at what parties' arguments might be[,]" we note that in this case, the facts regarding the excessive confinement of Rikki and Joseph were sufficiently established in the record and provide substantial evidence to support Defendant's convictions. *State v. Fuentes*, 2010-NMCA-027, ¶ 29, 147 N.M. 761, 228 P.3d 1181.

**D.      Expert Testimony**

Defendant asks this Court to reverse his convictions and remand his case for retrial because the district court allowed expert testimony regarding Joseph's injuries from Dr. Campbell, a forensic physician. Defendant asserts that Dr. Campbell's testimony was admitted in error because she was not trained or certified as a forensic pathologist. The district court allowed the testimony, finding that Defendant's concerns went to the weight of her testimony rather than its admissibility, and specifying that her testimony be couched in terms of medical probability. The admission of expert testimony is within the sound discretion of the district court and, absent an abuse of discretion, will not be reversed by this Court on appeal. *State v. Alberico*, 116 N.M. 156, 169, 861 P.2d 192, 205 (1993). Rule 11-702 NMRA requires three prerequisites for admission of expert testimony: (1) the expert must be qualified;

19

(2) the scientific evidence must assist the trier of fact; and (3) the expert may only testify to "scientific, technical or other specialized knowledge." *Alberico*, 116 N.M. at 166, 861 P.2d at 202 (internal quotation marks and citation omitted).

Dr. Campbell explained her training and experience as a forensic pediatrician and child abuse expert before the district court recognized her as an expert witness. Dr. Campbell explained that her training included wound identification and that her evaluations were of living children. She further explained that she was not trained or certified as a forensic pathologist and that a forensic pathologist examines the dead, rather than the living. Defendant has argued that Dr. Campbell did not have specific training in evaluating wounds from a forensic pathology perspective. Again, Defendant failed to elaborate or develop this argument regarding why Dr. Campbell's qualifications as a forensic pediatrician were insufficient to assist the jury in determining the causes of Joseph's injuries or why the field of pathology was necessary to qualify Dr. Campbell as an expert in forensic pediatrics and general medicine. Again, this Court does not review unclear or undeveloped arguments. *See Fuentes*, 2010-NMCA-027, ¶ 29. As such, we will not consider this argument further.

**E.      Remaining Claims of Error**

Defendant raises several additional claims of error under *Franklin*, 78 N.M. at 129, 428 P.2d at 984 (advising appellate counsel to advance a defendant's arguments

even if their merits are questionable) and *Boyer*, 103 N.M. at 659, 712 P.2d at 5 (recognizing that an attorney should present a client's contentions even if counsel has no faith in them). Defendant raises challenges to the jury instructions, the special verdict form, the district court's failure to grant Defendant's request for a continuance, and finally he argues that his verdicts were inconsistent. We have considered Defendant's remaining arguments and agree with the State regarding each of these issues. We determine that Defendant's remaining arguments are without merit and find it unnecessary to discuss them further. *See State v. Telles*, 2011-NMCA-083, ¶ 25, 150 N.M. 465, 261 P.3d 1097.

**CONCLUSION**

For the foregoing reasons, we reverse Defendant's conviction for conspiracy to commit intentional child abuse and affirm Defendant's convictions for kidnapping and conspiracy to commit kidnapping. We remand this matter to the district court for dismissal of the conspiracy to commit intentional child abuse and for any further proceedings that are necessary to effectuate our decision.

**IT IS SO ORDERED.**

_____

**TIMOTHY L. GARCIA, Judge**

**WE CONCUR:**

21

_____

**RODERICK T.  KENNEDY, Chief Judge**


_____

**MICHAEL E.  VIGIL, Judge**